IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 19- |
| | : | |
| v. | : | DATE FILED: |
| | : | |
| NEIL K. ANAND | : | VIOLATIONS: |
| ASIF KUNDI | : | 18 U.S.C. § 1347 (health care fraud – 1 |
| ATIF MAHMOOD MALIK | : | count) |
| VIKTORIYA MAKAROVA | : | 21 U.S.C. § 846 (conspiracy to distribute |
| | : | controlled substances –1 count) |
| | : | 18 U.S.C. § 2 (aiding and abetting) |
| | : | Notice of forfeiture |

## INDICTMENT

### COUNT ONE

### (Health Care Fraud)

**THE GRAND JURY CHARGES THAT:**

At all times material to this Indictment:

1. The defendant NEIL K. ANAND was a medical doctor who held himself out as a provider for pain management and addiction medicine. Defendant ANAND was licensed to practice medicine in the Commonwealth of Pennsylvania. Defendant ANAND was registered with the Drug Enforcement Administration ("DEA") for the purpose of prescribing controlled substances.

2. Defendant NEIL K. ANAND operated a medical practice that focused on pain management at three locations: 5000 Frankford Avenue, Suite 2, Philadelphia, PA; 5735 Ridge Avenue, Suite 101, Philadelphia, PA; and 3554 Hulmeville Road, Suite 101, Bensalem, Pennsylvania (collectively referred to as the "PRACTICE"). Defendant ANAND also owned several non-pharmacy dispensing sites which provided in-office dispensing of medications to patients at the PRACTICE, including Anand Medical Investment ("AMI"), Institute of Advanced

Medicine and Surgery ("IAMS"), and Bucks County Pain and Perioperative PLLC doing business as Bucks County Spine and Pain Medicine ("BCSPM") (collectively referred to as the "DISPENSARIES").

3. Defendant NEIL K. ANAND and the DISPENSARIES participated in numerous federal and private insurance health care plans, including the Medicare Program, federal health care plans paid for by the Office of Personnel Management and the Department of Labor Office of Workers' Compensation Program, and private plans administered by Independence Blue Cross.

4. Defendant ASIF KUNDI was a foreign trained physician who was not licensed to practice medicine in the United States. Defendant KUNDI worked for defendant NEIL K. ANAND at the PRACTICE from 2017 through June 2019 and managed the DISPENSARIES.

5. Defendant ATIF MAHMOOD MALIK was a foreign trained physician who was not licensed to practice medicine in the United States. Defendant MALIK worked for defendant NEIL K. ANAND at the PRACTICE from 2017 through June 2019.

6. Defendant VIKTORIYA MAKAROVA was a licensed nurse practitioner who worked for defendant NEIL K. ANAND at the PRACTICE from June 2018 through January 2019.

### *The Medicare Program*

7. The Medicare Program ("Medicare") was a federally-funded health care program that provided benefits to persons who are at least 65 years old or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS"). Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries." Medicare was

divided into multiple parts: Part A covered hospital inpatient care, Part B covered physicians' services and outpatient care, Part C was Medicare Advantage Plans, and Part D covered prescription drugs.

8. Medicare was a "Federal health care program" as defined in Title 42, United States Code, Section 1320a-7b(f) and a "health care benefit program" as defined in Title 18, United States Code, Section 24(b).

9. A medical provider was required to enroll with Medicare in order to submit claims for payment to CMS. To enroll in Medicare, a medical provider was required to enter into an agreement with CMS in which the provider agreed to comply with all applicable statutory, regulatory, and program requirements for reimbursement from Medicare. By signing the Medicare enrollment application, the provider certified that the provider understood that payment of a claim was conditioned on the claim and the underlying transaction complying with Medicare regulations, Medicare Program instructions, the law, and on the provider's compliance with all applicable conditions of participation in Medicare.

10. Medicare covered prescriptions that were obtained from a state-licensed physician, or other appropriately licensed health care provider, who was registered as required with the DEA. Medicare required that any drug prescribed by a participating provider must be safe and effective and otherwise reasonable and necessary and would only reimburse for claims for prescriptions that were prescribed within the course of professional practice and for a legitimate medical purpose. Generally, a pharmacy submitted the claim to Medicare for the prescription medication using the information contained in the prescription, such as prescriber's name, patient information, drug, strength, and quantity dispensed. Medicare relied on the accuracy of the information in a claim when making payments and presumed that the underlying

prescription was written within the usual course of professional practice and for a legitimate medical purpose. Medicare did not reimburse for medically unnecessary medications.

### *Other Insurance Programs*

11. The Office of Personnel Management ("OPM") served as the chief human resources agency and personnel policy manager for the federal government. Among its many duties, OPM managed the Federal Employees Health Benefits Program ("FEHBP"). FEHBP benefits were afforded to all federal employees and their family members who chose from over 300 FEHBP contracted health insurance carriers. Benefits were administered by private insurance companies and paid for, in large part, by OPM. A medical provider must have been enrolled with OPM as a participating provider in order to submit claims to OPM for medical services to federal employees and their family members.

12. The United States Department of Labor Office of Workers' Compensation Program ("OWCP") administered the federal workers' compensation program which provided certain benefits, including health care benefits and wage loss replacement, to federal employees who sustained work-related injuries. *See* 5 U.S.C. §§ 8101, *et seq.* Providers were required to enroll with OWCP through its designated bill processing agent and to submit claims for payment under their issued provider number.

13. Independence Blue Cross ("IBC") was a private insurance company that offered health insurance plans for individuals and families throughout southeastern Pennsylvania. IBC was the largest health insurer in the Philadelphia area and offered a wide variety of health plans, including managed care and traditional indemnity insurance. A medical provider must have been enrolled with IBC as a participating provider in order to submit claims to IBC for medical services.

14. Like Medicare, OPM, OWCP, and IBC required that any drug prescribed by a participating provider must be safe and effective and otherwise reasonable and necessary and only reimbursed for claims for prescriptions for controlled substances that were prescribed within the course of professional practice and for a legitimate medical purpose by a state-licensed physician or other appropriately licensed health care provider.

15. A copayment or copay was a is a fixed amount paid by a patient for receiving a particular health care service, with the remaining balance covered by the person's insurance company. Medicare, OPM, OWCP, and IBC used copayments to deter people from seeking medical care that may not be necessary. Medicare, OPM, OWCP, and IBC prohibited the routine waiver of copayments.

***The Fraudulent Scheme***

16. From in or about November 2015 to in or about July 2019, the defendants NEIL K. ANAND, ASIF KUNDI, ATIF MAHMOOD MALIK, and VIKTORIYA MAKAROVA, together with others, executed a scheme to defraud health care benefit programs, as follows:

   a. The defendants provided patients with bags of medications, referred to as "Goody Bags," which contained numerous prescription medications that were dispensed by the DISPENSARIES based on what a particular patient's insurance covered, not the patient's medical need.

   b. The Goody Bags contained a variety of medically unnecessary medications, including analgesics, sedatives, muscle relaxants, and anti-inflammatory drugs.

   c. The defendants provided the Goody Bags to patients without dosing and usage directions.

        d.      The defendants did not collect copayments from the patients for the medications in the Goody Bags but required patients to falsely sign that they paid a copay.

        e.      The defendants required that patients accept the Goody Bags, which were medically unnecessary and not eligible for reimbursement, in order to receive prescriptions for pain medications, to include Schedule II controlled substances.

        f.      The defendants submitted, or caused to be submitted, fraudulent claims to health care benefit programs for medically unnecessary prescription medications that were dispensed by the DISPENSARIES.

        17.      From in or about November 2015 to in or about July 2019, defendant NEIL K. ANAND, through the DISPENSARIES, billed Medicare, OPM, and IBC for the Goody Bags and was paid over $4 million.

        18.      From in or about November 2015 to in or about July 2019, in the Eastern District of Pennsylvania, the defendants

**NEIL K. ANAND,**
**ASIF KUNDI,**
**ATIF MAHMOOD MALIK, and**
**VIKTORIYA MAKAROVA,**

together with others, knowingly and willfully executed and attempted to execute, and aided and abetted, a scheme and artifice to defraud one or more health care benefit programs, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, OPM health plans, and IBC, and to obtain, by means of materially false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of, Medicare, OPM, and IBC, in connection with the delivery of and payment for health care benefits, items and services.

        All in violation of Title 18, United States Code, Sections 1347 and 2.

## COUNT TWO

### (Conspiracy to Distribute Controlled Substances)

**THE GRAND JURY FURTHER CHARGES THAT:**

At all times material to this Indictment:

1. Paragraphs One through Six of Count One are incorporated here.

*The Controlled Substances Act*

2. The Controlled Substances Act ("CSA") governed the manufacture, distribution, and dispensation of controlled substances in the United States. With limited exceptions for medical professionals, the CSA made it unlawful for any person to knowingly or intentionally manufacture, distribute, or dispense a controlled substance or conspire to do so.

3. Medical practitioners, such as physicians, who were authorized to prescribe controlled substances by the jurisdiction in which they were licensed to practice medicine, were authorized under the CSA to prescribe, or otherwise distribute, controlled substances, if they were registered with the Attorney General of the United States. 21 U.S.C. § 822(b); 21 C.F.R. § 1306.03. A medical practitioner must have been registered with the DEA in order to prescribe controlled substances. Upon application by the practitioner, the DEA assigned a unique registration number to each qualifying medical practitioner.

4. Chapter 21 of the Code of Federal Regulations, Section 1306.04, which governed the issuance of prescriptions, provided that a prescription for a controlled substance must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice.

5. The CSA and its implementing regulations set forth which drugs and other substances were defined by law as "controlled substances," and assigned those controlled substances to one of five schedules (Schedule I, II, III, IV, or V) depending on their potential for

abuse, likelihood of physical or psychological dependency, accepted medical use, and accepted safety for use under medical supervision.

6. A controlled substance assigned to Schedule II had a high potential for abuse, was highly addictive, and had a currently accepted medical use in treatment in the United States or a currently accepted medical use with severe restrictions. Abuse of a Schedule II controlled substance could have led to severe psychological and/or physical dependence. Pursuant to the CSA and its implementing regulations, Oxycodone was classified as a Schedule II controlled substance. Oxycodone was sold generically and under a variety of brand names, including OxyContin, Roxicodone, Endocet, and Percocet. Oxycodone, an opioid pain medication, was about fifty percent stronger than Morphine. Oxycodone was among the Schedule II opioid controlled substances that had the highest potential for abuse and associated risk of fatal overdose.

7. From in or about November 2015 to in or about July 2019, the defendants NEIL K. ANAND, ASIF KUNDI, ATIF MAHMOOD MALIK, and VIKTORIYA MAKAROVA, together with others, prescribed Schedule II controlled substances, including Oxycodone, outside the usual course of professional practice and without a legitimate medical purpose. Specifically,

a. Defendant ANAND left pre-signed blank prescription pads at the PRACTICE for defendants KUNDI and MALIK to use to prescribe Schedule-II controlled substances to patients;

b. Defendant VIKTORIYA MAKAROVA gave blank pre-signed prescriptions to defendants MALIK and KUNDI to use to prescribe Schedule II controlled substances to patients; and

c. Defendants KUNDI and MALIK, who were not licensed to practice medicine in the United States and were not registered with the DEA, prescribed Schedule II controlled substances to patients.

8. From in or about November 2015 to in or about July 2019, in the Eastern District of Pennsylvania, the defendants

**NEIL K. ANAND,
ASIF KUNDI,
ATIF MAHMOOD MALIK, and
VIKTORIYA MAKAROVA,**

conspired with each other and with others known and unknown to the Grand Jury, to knowingly and intentionally distribute and dispense, without a legitimate medical purpose and outside the usual course of professional practice, a mixture and substance containing a detectable amount of oxycodone, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(C).

All in violation of Title 21, United States Code, Section 846.

## NOTICE OF FORFEITURE #1

**THE GRAND JURY FURTHER CHARGES THAT:**

1. As a result of the violations of Title 18, United States Code, Section 1347, set forth in this indictment, the defendants

**NEIL K. ANAND,
ASIF KUNDI,
ATIF MAHMOOD MALIK, and
VIKTORIYA MAKAROVA**

shall forfeit to the United States of America any property that constitutes or is derived from gross proceeds traceable to the commission of such offense.

2. If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

    (a) cannot be located upon the exercise of due diligence;

    (b) has been transferred or sold to, or deposited with, a third party;

    (c) has been placed beyond the jurisdiction of the Court;

    (d) has been substantially diminished in value; or

    (e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property subject to forfeiture.

All pursuant to Title 18, United States Code, Section 982(a)(7).

## NOTICE OF FORFEITURE #2

**THE GRAND JURY FURTHER CHARGES THAT:**

1. As a result of the violations of Title 21, United States Code, Section 841, set forth in this indictment, the defendants

**NEIL K. ANAND,
ASIF KUNDI,
ATIF MAHMOOD MALIK, and
VIKTORIYA MAKAROVA**

shall forfeit to the United States of America:

(a) any property used or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violations; and

(b) any property constituting, or derived from, proceeds obtained, directly or indirectly, from the commission of such violations.

2. If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the Court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to

seek forfeiture of any other property of the defendant up to the value of the property subject to forfeiture.

All pursuant to Title 21, United States Code, Section 853.

_____
GRAND JURY FOREPERSON

_____
WILLIAM M. MCSWAIN
United States Attorney
Eastern District of Pennsylvania

ROBERT ZINK
Chief
Criminal Division, Fraud Section