**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **NEIL K. ANAND** *et al.* | : | **No. 19-518** |

## <u>M E M O R A N D U M</u>

PRATTER, J.                                                                    AUGUST <u>15</u>, 2022

In federal criminal prosecutions, the power of the United States Government is brought to bear against those accused of wrongdoing. Because of the asymmetry of power between the Government and a defendant, our Constitution and legal system holds the Government to high standards and our society holds the Government to even higher expectations. That does not mean, however, that the Government never makes mistakes, for "what is government itself, but the greatest of all reflections on human nature?" Federalist No. 51, at 294 (James Madison) (Am. Bar. Ass'n ed. 2009).

In this longstanding criminal prosecution of alleged health care fraud and conspiracy to distribute controlled substances, the Government viewed certain documents that contained potentially privileged communications between one of the defendants, Neil Anand, and various of his attorneys. Arguing that the Government's conduct violated his right to counsel under the Sixth Amendment to the United States Constitution, Mr. Anand moves to dismiss the Government's indictment. But, while the Government undeniably made careless blunders, its conduct did not so invade Mr. Anand's attorney-client privilege as to rise to the level of a Sixth Amendment violation. Plus, even if it had risen to this level, Mr. Anand's requested remedies are not warranted under the facts presented. Therefore, the Court denies Mr. Anand's motion.

**BACKGROUND**

### I.    Factual Background

According to the indictment, Mr. Anand operated a medical practice focused on pain management at three locations in the greater Philadelphia area as well as three dispensaries for pain medication. His practice and dispensaries participated in numerous health insurance plans, including Medicare, federal health care plans through the Office of Personnel Management, and private plans. Medicare covered the cost of prescriptions obtained from a state-licensed physician or other licensed health care provider and would only reimburse prescription claims if the prescriptions were prescribed within the course of professional practice and for a legitimate medical purpose. The claims were generally submitted by a pharmacy; and Medicare relied on the accuracy of the underlying prescription information from the medical provider/prescriber. The other health insurance plans operated similarly.

Between approximately November 2015 and July 2019, Mr. Anand, along with his associates and co-defendants in this case, Asif Kundi, Atif Mahmood Malik, and Viktoriya Makarova, provided patients with "Goody Bags" of medications from Mr. Anand's dispensaries based on what the particular patient's insurance *would cover*, not what the patient *actually needed*. These bags contained a variety of unnecessary medications, were given without any directions, and the defendants allegedly did not collect the patients' insurance copay, but instead made them sign a form falsely stating they had paid the copay. The defendants expressly conditioned the prescribing of pain medications, including Schedule II narcotics, on patients accepting and signing for these "Goody Bags." As part of the scheme, the defendants either directly submitted or caused to be submitted false claims to the various health insurance plans. This scheme allegedly resulted in approximately $4 million in health plan payments to the defendants between 2015 and 2019.

Based on these allegations, a grand jury returned an indictment against Mr. Anand on September 10, 2019, alleging two counts: (1) health care fraud in violation of 18 U.S.C. § 1347 and (2) conspiracy to distribute controlled substances in violation of 21 U.S.C. § 846.

## II.   The Government's Investigation

Mr. Anand filed a motion to dismiss the indictment based on discovery errors related to attorney-client privilege. The Court held two hearings on Mr. Anand's motion to dismiss, including one evidentiary hearing at which both parties had the opportunity to call and examine witnesses in order to establish facts on the record regarding the Government's investigation. The Court draws from both the parties' briefing and the evidentiary hearing to explain what has turned into a tangled morass.

### A.  <u>Preparation for Execution of Search Warrant</u>

After the grand jury returned the indictment, the Government obtained a search warrant for Mr. Anand's residence and three medical offices. In its affidavit for the search warrant, the Government noted its awareness that Mr. Anand was represented by at least two attorneys and explained that if law enforcement came across any potentially privileged material, they would be directed to identify and set aside those materials, record the attorneys' names, and direct other law enforcement not to view the materials. Ex. A to Def.'s Mot. ¶ 105, Doc. No. 118-3; Gov.'s Resp., at 2–3, Doc. No. 121; July 7, 2022 Hr'g Tr., at 15:22–16:11, Doc. No. 175.

As multiple witnesses explained at the July 7, 2022 hearing, the Government briefed agents from various agencies about the requirements of the search warrant and the protocols to be used when executing the warrant. The team executing the warrant consisted of approximately 80 people comprising both state and federal officials, including FBI agents, Department of Health and Human Services agents, agents from the Post Office's Office of the Inspector General, members of the federal Office of Personnel Management, members of the Pennsylvania Attorney General's

office, Pennsylvania Health and Human Services personnel, and two Philadelphia police officers. July 7, 2022 Hr'g Tr., at 12:20–13:4, Doc. No. 175.

Special Agent Joseph Majarowitz was the FBI Special Agent in charge of the overall coordination and execution of the arrest and search warrants. *Id.* at 11:18–23. He was assisted by John Dolan, who Agent Majarowitz described as the second in command. *Id.* at 14:2–3. Agent Dolan oversaw four other agents assigned as team leaders for the four search locations where the searches would be executed. *Id.* at 14:5–11. In the days leading up to the execution of the warrants, the Government conducted multiple briefings. *Id.* at 13:22–24. Multiple witnesses testified that they remembered instructions about handling potentially privileged material being given at certain briefings but not others. *Compare id.* at 31:14–18, *with id.* at 81:9–82:5, *and id.* at 104:24–105:21, *and id.* at 31:19–32:1. As Agent Majarowitz explained, both he and Agent Dolan ensured that these instructions were communicated to the search teams in some form, but they could not guarantee that each individual member of the various search teams followed the instructions. *Id.* at 32:7–15, 54:11–18.

At the time of the searches, the Government had not established any Filter Team to review potentially privileged materials, and it was not standard procedure for the Government to do so. *Id.* at 42:24–43:3.

## B. Execution of Searches

On September 25, 2019, the Government executed searches pursuant to the warrant at a total of six locations: three on Mr. Anand's medical practices, one on his personal residence, one on his personal vehicle, and one on a post office box. *Id.* at 12:5–19. The Government set out to seize two types of evidence: (1) electronic materials (e.g., computers, hard drives, etc.) and (2) paper materials. Gov.'s Resp., at 3, Doc. No. 121; July 7, 2022 Hr'g Tr., at 17:17–24, 55:2–4, Doc. No. 175.

4

The Government was assisted in its efforts to collect electronic materials by members of the FBI's Regional Computer Forensic Laboratory ("RCFL"). July 7, 2022 Hr'g Tr., at 17:25–18:17, 90:9–15, Doc. No. 175. RCFL agents were on-site to determine what electronic components could be unplugged and transported easily versus which could be scanned on-site without needing transportation. *Id.* at 18:11–17. But, even if the members of the RCFL identified materials to be taken off-site, that task was still performed by the FBI agents, who later transported the materials, after they were documented, to the RCFL. *Id.* at 18:18–19:5. Once at the RCFL, the electronic items seized from Mr. Anand were to be "imaged," which means a technician would make an exact copy of the item, for example, a computer hard drive. *Id.* at 90:25–91:3, 91:16–21, Doc. No. 175.

As for paper materials at each of the search locations, they were placed into evidence boxes and numbered in ascending order with identifying information written onto each box indicating the location of the specific materials (*i.e.*, the room inside a specific location in which the items were seized). *Id.* at 19:11–21. The evidence from each location was tracked with an evidence log. *Id.* at 20:20–21:4. From there, the evidence from each of the locations was transported back to the FBI's office in downtown Philadelphia where it then received a new evidence number taking into account all of the evidence recovered at all of the locations. *Id.* at 19:23–20:7. These boxes were then formally transferred over into the custody of the FBI case agent in charge of this particular investigation. *Id.* at 34:2–35:17.

### C. <u>Identification of Potentially Privileged Information During Execution of Searches</u>

At one of the search locations that day, Mr. Anand's medical practice at 3554 Hulmeville Road in Bensalem, Pennsylvania, *id.* at 12:10, 19:13–14, agents identified hard-copy paper documents that contained potentially attorney-client privileged material, *id.* at 21:5–16. That box was placed into an evidence box labeled as "Box 17" and agents noted that it contained potentially

privileged material by writing that in marker on the exterior of the box. *Id.* at 21:17–25, 63:10–15. That this box might have contained potentially privileged information was also recorded into (1) the physical evidence log for that item and (2) the FBI's digital evidence tracking system. *Id.* at 22:8–20, 40:11–19. This was the only seized hard-copy evidence that any member of the search teams identified that day as containing potentially privileged materials.[1] *Id.* at 33:6–11. The evidence log for "Box 17" is a log of who has checked the evidence out of the Government's custody, not necessarily a log of who has viewed the contents of the box itself. *Id.* at 42:4–15.

According to the terms of the affidavit attached to the search warrant, the Government was supposed to, in addition to setting the material aside, record the names of any attorneys identified in the potentially privileged materials. *Id.* at 29:21–25. Agent Majarowitz and Agent Dolan, however, were not aware whether a list of attorney names was ever recorded during the process of executing the search warrant. *Id.* at 30:1–10, 58:12–14.

### D. Process for Uploading Materials into the Relativity Database

The goal, after seizing the various materials in this particular case, was to upload them to "Relativity," which is a web-based application for review of evidence. *Id.* at 127:20–23. The Government can upload all materials, both electronic materials and scanned hard-copy materials, into a single database that can be accessed by multiple people at a time. *Id.* at 128:1–7. However, each case within Relativity is separate, so only people with access to a particular case may view any of the materials uploaded to that specific Relativity case database. *Id.* at 127:23–128:1. Login information controls who can view the materials of a particular case. *Id.* at 128:8–16. In other words, only certain people are given access to a particular case database, such that any person

---

[1] Agent Dolan also explained that members of the search team assigned to Mr. Anand's residence came across a document that was a letter from one attorney to another attorney but, after consultation with a member of the United States Attorney's Office, that document was not seized. July 7, 2022 Hr'g Tr., at 56:20–57:7, Doc. No. 175.

without access would not be able to view any of the materials on Relativity. *Id.* at 25:20–25, 72:1–4. In order to make this possible, however, the Government needed to first upload all of the seized materials into this database.

### E.   Initial Review of the Potentially Privileged Hard-Copy Documents

After "Box 17" was marked and transported back to the FBI's office in Philadelphia, it remained in a file review area where all of the evidence remained until the FBI sent it out for copying and scanning. *Id.* at 23:19–23. Within a week of the items being seized and returned to the FBI's office in Philadelphia, the case agent on the case, Agent Martin McDonald, requested permission from Agent Majarowitz to do an initial privilege review of the items in "Box 17." *Id.* at 23:23–24:3. Specifically, Agent McDonald requested permission for another person working on the search team, Philadelphia police officer Detective Steve Snyder, to review the materials and determine what, if anything, needed to be sequestered from the materials in "Box 17." *Id.* at 24:3–8; 63:15–24. Agent McDonald selected Detective Snyder to do this review because he would have no further involvement in the case after his assistance with the arrest team. *Id.* at 37:20–38:1. This process took approximately 15 minutes, during which Detective Snyder identified and segregated certain materials he identified as containing potentially privileged information and placed those materials into a standard accordion legal file folder, which remained unreviewed in the file review room in the FBI's Philadelphia office until preparation for the hearing on this motion, at which point Agent Majarowitz directed a new agent who was not involved in the case to forward the materials to the Filter Team. *Id.* at 24:8–15, 24:22–25:10, 48:23–49:5, 67:6–17.

Agent Majarowitz clarified that once "Box 17" was marked as containing potentially privileged information, only a member of the Filter Team would have been able to review that material. *Id.* at 36:21–37:2. He also testified, however, that Detective Snyder was not a member of the Filter Team, and the Government received no other authorization from the United States

7

Attorney's office to have Detective Snyder review the materials. *Id.* at 37:3–5, 37:14–17. Agent Majarowitz was not aware whether Detective Snyder ever received training to identify or evaluate materials that might be potentially privileged. *Id.* at 44:25–45:6. Likewise, Agent McDonald testified that he did not receive any authorization from the United States Attorney's Office for Detective Snyder to review the potentially privileged materials, was not aware whether Detective Snyder was qualified to review the materials, and noted that Detective Snyder had no knowledge of the case nor of Mr. Anand's attorneys who were potentially involved. *Id.* at 75:9–77:2. Agent McDonald also did not review the search warrant to determine how he was supposed to handle this particular information. *Id.* at 75:6–8. In addition, Agent McDonald reviewed boxes of the paper materials containing patient files to determine if they contained any privileged materials but determined that no box contained potentially privileged materials. *Id.* 71:7–21. The agents testified that only Agent McDonald and Detective Snyder reviewed these documents and that, to the best of their knowledge, they were not reviewed by any other person prior to being shipped to the contractor for scanning.

After this review, on November 5, 2019, the FBI sent all of the hard-copy evidence items, including the materials in "Box 17" (except those materials that had been segregated) to a contractor in Washington, DC named "CACI" to scan and upload them to the Relativity database for the Government's review.[2] *Id.* at 24:16–21, 41:7–16, 66:5–6, 66:17–20, 74:5–20. They were

---

[2] Agent Majarowitz testified that the November 5, 2019 entry on the chain of custody form for "Box 17" did not correspond to Detective Snyder's review. July 7, 2022 Hr'g Tr., at 41:14, Doc. No. 175. But Agent Majarowitz could not be certain that this entry reflected the evidence being signed out to be sent to the scanning facility in Washington, DC. *Id.* at 41:7–22. Agent McDonald, on the other hand, first testified that the November 5, 2019 entry corresponded to "Box 17" being sent to for scanning, *id.* at 65:9–20, 66:11–14, 74:5–12, but then later testified that the entry on November 5, 2019 was the initial privilege review done by Detective Snyder, *id.* at 77:3–16. However, Agent McDonald also testified that the FBI retook custody of the materials on January 14, 2020. *Id.* at 66:7–9.

Based on the chain of custody showing the FBI relinquishing custody on November 5, 2019 and not retaking custody of the hard-copy materials until January 14, 2020, the Court does not credit Agent

uploaded to the Government's Relativity database on February 7, 2020. Def.'s Mot. ¶ 6, Doc. No. 118; Gov.'s Resp., at 3, Doc. No. 121. Once the materials were uploaded to Relativity, the FBI agents who assisted in the actual execution of the searches would not have any access to any of the documents because all of the materials were stored on Relativity, and they lacked access to that database. July 7, 2022 Hr'g Tr., at 26:17–20; 71:22–72:4, Doc. No. 175.

The chain of custody log notes that the documents came back to the FBI on January 14, 2020. *Id.* at 66:7–9; Gov't Ex. 2. At that point, the hard-copy documents did not return to the FBI, but instead were stored in the basement of the Federal Building, such that no FBI agent had access to the hard copies of the documents again. July 7, 2022 Hr'g Tr., at 26:21–27:6, Doc. No. 175.

### F.  Initial Review of Seized Electronic Materials

In October 2019, after the Government seized the electronic materials, one of Mr. Anand's former attorneys sent the Government a list of 16 names of counsel that *might* appear in the seized electronic materials. Def.'s Mot. ¶ 4, Doc. No. 118; Gov.'s Resp., at 3, Doc. No. 121. The United States Attorney's Office contacted Agent McDonald with a list of terms that it wanted the RCFL to use to run a search of the seized electronic materials in order to check for potentially privileged information in those materials. July 7, 2022 Hr'g Tr., at 67:21–68:8, 68:20–69:2, Doc. No. 175. Agent McDonald understood that the RCFL was going to run the list of terms to search for any

---

McDonald's testimony that the November 5, 2019 entry corresponds to Detective Snyder's cursory review of the materials for any potentially privileged documents. Agent Majarowitz testified that Detective Snyder's review took about 15 minutes. *Id.* at 24:8–11. Thus, it plainly would not make sense that the November 5, 2019 entry on the chain of custody document, which shows the evidence being out of the FBI's custody for two months, corresponded to Detective Snyder's few-minute review of the documents. *See* Gov't Ex. 2. Plus, Agent Majarowitz testified that Detective Snyder would not be required to place an entry into the chain of custody log because his review would not have meant the materials ever left FBI custody. July 7, 2022 Hr'g Tr., at 42:4–15, Doc. No. 175. Thus, for purposes of this motion, the Court finds that the November 5, 2019 entry on the chain of custody for "Box 17" corresponds to the FBI sending that box, along with all other hard-copy evidence, to be scanned for uploading to the Relativity database.

potentially privileged information in the seized electronic materials.[3] *Id.* at 69:23–70:2, 70:14–19. While it was the FBI's responsibility to ensure this review was done, another FBI agent was in charge of communicating directly with the RCFL to ensure the RCFL completed the review. *Id.* at 78:9–22. Thus, Agent McDonald could not recall what, if any, response he got back from the RCFL in regard to running this search. *Id.* at 72:16–19.

Lindsey Barlett was the digital forensic examiner at the FBI's Regional Computer Forensic Laboratory tasked with imaging (copying) the seized electronic materials. *Id.* at 73:3–7, 88:24–25, 91:19–21. Upon receiving the email with the list of search terms to be run from the United States Attorney's office via Agent McDonald, Ms. Barlett understood the terms to be for the examination portion of the FBI's request, not her assigned task of "imaging" (copying) the materials, so she set the search terms aside and did not run a search in the seized electronic materials using these terms. *Id.* at 92:8–19. After she completed the "imaging" of the materials in early November 2019, Ms. Barlett uploaded the seized electronic materials to the Case Agent Investigative Review tool so that the assigned case agent could begin to review the materials for any potentially privileged information. *Id.* at 93:10–18. Ms. Barlett understood her task to be copying the seized materials *only* and did not understand her task to be reviewing the materials for any potentially privileged information. *Id.* at 92:8–12, 92:16–19. That is because, at least in Ms. Barlett's experience, the case agents typically performed the review for potentially privileged materials rather than the digital forensic examiner. *Id.* 98:3–6. In other words, Ms. Barlett thought that the case agents would be the ones reviewing for potentially privileged materials in the seized electronic materials, while the case agents, such as Agent McDonald, understood that Ms. Barlett would be doing the privilege review before sending the materials back to them.

---

[3] Agent Majarowitz also understood that the RCFL was going to do this initial review but could not verify whether that had been done. July 7, 2022 Hr'g Tr., at 27:7–22, Doc. No. 175.

Ms. Barlett testified that there are no standard procedures within the RCFL for handling potentially privileged material and she was not aware of any standard procedures used by the FBI for handling the same. *Id.* at 98:10–15. Ms. Barlett was given no instruction about how to review for potentially privileged information from the United States Attorney's Office besides being given the list of terms to search. *Id.* at 98:16–99:4. In the past when she had done similar reviews, Ms. Barlett noted that nobody checked her work and the discovery material would then be sent to the members of the Prosecution Team, but that there were no written instructions or policies to that effect. *Id.* at 98:10–12, 99:17–100:3.

The seized electronic materials were uploaded to the Government's Relativity database on February 25, 2020. Def.'s Mot. ¶ 6, Doc. No. 118; Gov.'s Resp., at 4, Doc. No. 121. Like the seized hard-copy materials, once this information was uploaded to the Relativity database, the FBI agents involved in executing the searches could not access it. July 7, 2022 Hr'g Tr., at 26:17–22, 71:22–72:4, Doc. No. 175.

### G.  Government's Review of Seized Materials Within the Relativity Database

After the Government had uploaded all of the seized materials, paper and electronic, to the Relativity database, it began to review the materials in early March 2020.[4] This review was done by a number of agents in batches, by assigning a range of documents to an individual agent for an initial review, which was tracked using a spreadsheet. *Id.* at 83:21–84:10, 106:18–25.

Within each case in Relativity, there are two "sides" to each case, the "case side" and the "filter side." An individual given access to the case side would not be able to access the filter side.

---

[4] The Government produced a copy of the seized electronic materials to Mr. Anand on December 5, 2019. Gov't's Resp., at 3, Doc. No. 121. Although it was offered to them, the other defendants in this case have not yet received a copy of these same materials because they have not provided the Government with a hard drive. *Id.* at 3 n.2. Likewise, the Government produced a digitized copy of the seized hard-copy materials on January 7, 2020 to both Mr. Anand and the other defendants in this case. *Id*. at 3; Def.'s Mot. ¶ 5, Doc. No. 118.

*Id.* 129:17–130:16. This is to allow a member on the filter side to review documents without anyone on the case side knowing that a member of the filter side reviewed documents, which documents that filter member viewed, or anything about the filter side's interactions within Relativity. *Id.* at 130:10–16.

On March 2, 2020, the case agents reviewing the Relativity database realized that the review for potentially privileged materials in the seized electronic materials had not been completed. Def.'s Mot. ¶ 7, Doc. No. 118; Gov.'s Resp., at 4, Doc. No. 121. At this time, the Relativity database was temporarily locked down in order to remove the electronic materials, halting review by the Prosecution Team. Gov.'s Resp., at 4, Doc. No. 121; July 7, 2022 Hr'g Tr., at 84:14–23, Doc. No. 175. That same day, FBI case agents contacted Ms. Barlett again to have her run a list of search terms on the seized electronic materials. July 7, 2022 Hr'g Tr., at 95:3–11, Doc. No. 175. She ran the search terms and then tagged and filtered those specific items out so that they would not come up in subsequent searches. *Id.* at 96:2–6. On March 9, 2020, the Government removed the Prosecution Team's access to the seized electronic materials and moved those materials over to the filter side of the Relativity database. *Id.* at 131:17–25.

While the seized electronic materials were removed from Relativity, the Prosecution Team continued to review the digitized seized hard-copy materials in Relativity. *Id.* at 85:3–5. However, on April 10, 2020, Agent Paul Rich for the FBI noticed what he thought was a potentially privileged document in the hard-copy materials because the email address of one of Mr. Anand's former attorneys appeared at the top of a document. *Id.* at 107:1–12, 107:24–108:2. Agent Rich contacted a DOJ employee who had set up the Relativity database and asked her to remove this particular document from the database. *Id.* at 107:22–24. Later that same day, Agent Rich discovered what he thought to be another potentially privileged document and followed the same

procedure. *Id.* at 108:14–20. On Monday, April 13, 2020, Agent Rich again came across a document that he thought might be potentially privileged and, at that point, the United States Attorney's Office made the decision to shut down the Relativity database entirely until they could investigate and determine why potentially privileged documents remained in the Relativity database. *Id.* at 85:6–17, 108:21–109:7. On April 13, 2020, the Government removed the Prosecution Team's access to the digitized seized hard-copy materials and moved those materials to the filter side of the Relativity database. *Id.* at 132:11–19.

Agent Rich also testified that he was not aware when a Filter Team was first established in this case, *id.* 111:10–12, or whether there was any policy or procedure in place for filtering out potentially privileged documents, *id.* at 111:21–112:15. When Agent Rich corresponded with a member of the United States Attorney's Office and that attorney noted that they needed to determine what in the protocols were insufficient to capture certain potentially privileged documents, Agent Rich was not aware of any specific protocol. *Id.* at 117:1–18. Further, while Agent Rich was aware that the terms of the search warrant required any member of the team who came across the name of an attorney to segregate that material, he was never given instructions to that effect. *Id.* at 118:19–119:3.

### H. Government's Communication with Mr. Anand

Although the Government first learned that the Relativity database contained potentially privileged materials in March and April 2020, it did not communicate this information to Mr. Anand until August 4, 2020 via a phone call to Mr. Anand's counsel. Gov.'s Resp., at 4, Doc. No. 121. This was apparently "due to a change in government personnel assigned" and the delay "occurred while the [new personnel] brought themselves up to speed on this matter." Filter Team's Supp. Resp., at 2 n.1, Doc. No. 122-1. On August 13, 2020, the Government sent a letter to Mr. Anand's counsel memorializing the disclosure of the potentially privileged information to

members of the Prosecution Team. Ex. C. to Def.'s Mot., Doc. No. 118-5; Gov.'s Resp., at 4, Doc. No. 121.

In August and September of 2020, the Government produced copies of the seized materials to Mr. Anand along with the list of search terms it had run of those materials and the specific documents that responded to those search terms. Def.'s Mot. ¶¶ 10–11 & n.2, Doc. No. 118; Gov.'s Resp., at 4–5 Doc. No. 121.

### I.   Potentially Privileged Documents Viewed by the Prosecution Team

After the Government discovered that it had not segregated potentially privileged materials and after Mr. Anand moved to dismiss the indictment on this basis, the Government's Filter Team determined that 9,940 documents in the Relativity database responded to certain search terms such that they might contain potentially privileged material. July 7, 2022 Hr'g Tr., at 136:25–137:6, Doc. No. 175. A document responded to the Filter Team's search if one of the search terms appeared anywhere in the document, not necessarily on the first page. *Id.* 142:10–14. Of those documents, the Prosecution Team had actually viewed 921. *Id.* at 137:12–14, 142:2–4. However, the Government's Relativity software does not track how many pages or which particular pages of a multi-page document any particular member views. Instead, the program only tracks when a person views a document, not *how much* of any particular document any person viewed. *Id.* at 138:6–19.

Of those 921 documents viewed by any member of the Prosecution Team, Mr. Anand submitted a privilege log to the Court in which he asserted privilege over four documents Bates stamped as AND-00014099, AND-00035749, AND-0035774, and AND-00036135. These documents were all within the digitized seized hard copy materials and were viewed by two members of the Prosecution Team, Mateo Marysol and Agent Paul Rich. Ex. C to Rhodes Decl., Doc. No. 151-2, at ECF 29–30.

The Court reviewed the substance of these documents *in camera* as part of its inquiry into Mr. Anand's motion to dismiss.

DISCUSSION

Federal Rule of Criminal Procedure 12 specifies certain reasons why a party may move to dismiss an indictment. Fed. R. Crim. P. 12(b)(3). But it is not an exhaustive nor an exclusive list. Fed. R. Crim. P. 12 advisory committee note to 2014 amendments. Instead, the rule clarifies that a party may "raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). A party may move to dismiss an indictment, for example, based on deliberate government misconduct that rises to the level of a due process violation. *See, e.g.*, *United States v. Voigt*, 89 F.3d 1050, 1064–65 (3d Cir. 1996); *United States v. Houghton*, 554 F.2d 1219, 1224 (1st Cir. 1977).

Here, Mr. Anand has moved to dismiss the indictment, arguing that the Government's conduct amounted to a Sixth Amendment violation because the Government reviewed certain materials containing potentially attorney-client privileged communications.

### I.   Mr. Anand Has Not Alleged a Sixth Amendment Violation Under the Governing Legal Standard

The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall . . . have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The Supreme Court has clarified that this "fundamental" right "is meant to assure fairness in the adversary criminal process." *United States v. Morrison*, 449 U.S. 361, 364 (1981). At the same time, the Supreme Court "recognized the necessity for preserving society's interest in the administration of criminal justice." *Id.* Thus, the Supreme Court struck a balance between fairness to the defendant and the need for criminal justice, explaining that "Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered

15

from the constitutional violation and should not unnecessarily infringe on competing interests." *Id.*

As a part of the Sixth Amendment right to counsel, federal courts have recognized the attorney-client privilege, noting it "is key to the constitutional guarantees of the right to effective assistance of counsel and a fair trial." *United States v. Neill*, 952 F. Supp. 834, 839 (D.D.C. 1997). That is because the privilege is meant "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981); *accord Westinghouse Elec. Corp. v. Republic of the Philippines*, 951 F.2d 1414, 1423 (3d Cir. 1991).

In one case before the Court of Appeals for the Third Circuit, *United States v. Levy*, the Court considered a defendant's appeal from a conviction on drug-related charges. 577 F.2d 200, 202 (3d Cir. 1978). Central to the appeal was the fact that two members of the conspiracy, Mr. Visceglia and Mr. Verna, nephew and uncle, were represented by the same counsel. *Id.* Once arrested by the DEA and indicted by a federal grand jury, Mr. Visceglia agreed to work as a government informant for both the DEA and the Bronx County District Attorney's office. *Id.* The DEA knew that Mr. Visceglia and Mr. Verna shared counsel. *Id.* Upon later learning that Mr. Visceglia had been working as a DEA informant, his counsel withdrew but continued to represent Mr. Verna *without informing Mr. Verna that Mr. Visceglia had been acting as an informant* and while still representing Mr. Visceglia in the related state case. *Id.* at 203. Even though the DEA learned information about Mr. Verna's defense strategy from Mr. Visceglia, the district court denied Mr. Verna's motion to dismiss the indictment. *Id.* at 204–05.

In reviewing the district court's decision, the Court of Appeals considered whether it would be proper for district courts to speculate as to the prejudice defendants experienced as a result of

an intrusion into privileged attorney-client communications. *Id.* at 208. The Court noted that such weighing of potential prejudice would be imprecise, explaining that "[w]here there is a knowing invasion of the attorney-client relationship and where confidential information is disclosed to the government, we think that there are overwhelming considerations militating against a standard which tests the sixth amendment violation by weighing how prejudicial to the defense the disclosure is." *Id.* Rather than attempting to determine whether or to what extent the defendant was prejudiced by the Government's conduct, the Court of Appeals, instead, analogized to the Fourth Amendment "fruit of the poisonous tree" jurisprudence and noted that "[n]o severe definition of prejudice, such as the fruit-of-the-poisonous-tree evidentiary test in the fourth amendment area, could accommodate the broader sixth amendment policies." *Id.* at 209. Thus, the Court of Appeals concluded, "the inquiry into prejudice must stop at the point where attorney-client confidences are actually disclosed to the government enforcement agencies responsible for investigating and prosecuting the case." *Id.* As such, the Court ordered that the Government's indictment be dismissed. *Id.* at 210.

Taking *Levy*'s soaring prose, Mr. Anand argues that in the instance of the Government's invasion of a defendant's attorney-client privileged communications, the Court should presume prejudice and, thus, a Sixth Amendment violation, shifting the burden to the Government to demonstrate that the defendant *did not* suffer any prejudice and to rebut a Sixth Amendment violation. In addition, Mr. Anand argues that if the Court only presumes prejudice in the instance of *intentional* Government conduct, the Government's actions here constitute an intentional intrusion.

Disagreeing with Mr. Anand's understanding of the law, the Government contends that the Court does not presume prejudice and that Mr. Anand is required to demonstrate prejudice. But,

the Government argues, even if the legal standard is that the Court presumes prejudice if the Government's intrusion was intentional, Mr. Anand has failed to show that the Government acted intentionally here.

The Court concludes that the parties are both right on the law to an extent, but that the point is ultimately academic. Under controlling precedent from the Court of Appeals for the Third Circuit, a defendant may assert a Sixth Amendment claim in a few different ways, only one of which carries a presumption of prejudice. But, regardless, resolution of the proper legal standard does not alter the Court's disposition because Mr. Anand has not carried his burden to make out a Sixth Amendment violation under any of the identified legal theories.

### A. The Court Does Not Automatically Presume Prejudice Under the Correct Legal Standard

To begin, cases subsequent to the Court of Appeals for the Third Circuit's holding in *Levy* have cabined its sweeping holding. Shortly after the 1978 *Levy* decision, the Supreme Court decided *United States v. Morrison*, 449 U.S. 361 (1981). There the court considered a situation in which DEA agents had questioned a defendant outside the presence of her known counsel in violation of her Sixth Amendment right. The Supreme Court assumed, without deciding, that a Sixth Amendment violation had taken place and clarified the appropriate remedies, explaining "[t]he premise of our prior cases is that the constitutional infringement identified has had or threatens some adverse effect upon the effectiveness of counsel's representation or has produced some other prejudice to the defense." *Id.* at 365. The Supreme Court further clarified that "absent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate." *Id.* The Court noted that in the Sixth Amendment context, like the Fourth and Fifth Amendment contexts, "[t]he remedy in

the criminal proceeding is limited to denying the prosecution the fruits of its transgression."[5] *Id.* at 366.

The Court of Appeals for the Third Circuit Court, too, has more recently elucidated the proper standard to apply. The Court of Appeals identified three potential Sixth Amendment violations: when "the government (1) intentionally plants an informer in the defense camp; (2) when confidential defense strategy information is disclosed to the prosecution by a government informer; or (3) when there is no intentional intrusion or disclosure of confidential defense strategy, but a disclosure by a government informer leads to prejudice to the defendant." *United States v. Costanzo*, 740 F.2d 251, 254 (3d Cir. 1984), *cert. denied*, 472 U.S. 1017 (1985); *see also Weatherford v. Bursey*, 429 U.S. 545, 558–59 (1977) (no Sixth Amendment violation when informant in defense camp did not purposefully intrude, taint evidence, or communicate defense strategy to the prosecution). In *Costanzo*, the Court of Appeals reconsidered its prior holding in *Levy* and stated, "*Levy* held that prejudice, and thus a violation of the sixth amendment, will be presumed to occur when confidential defense strategy is disclosed to the government by an informer."[6] *Costanzo*, 740 F.2d at 257. In other words, the Court of Appeals incorporated *Levy*'s presumption of prejudice into the second scenario that it identified. *See id.* at 254.

---

[5] The Supreme Court's statement on this particular point almost directly contradicted the Court of Appeals' statement in *Levy*, quoted above, about the relevance of the Fourth Amendment "Fruit of the Poisonous Tree" Doctrine to the Sixth Amendment. *Compare Levy*, 577 F.2d at 209, *with Morrison*, 449 U.S. at 366.

[6] Most recently, the Court of Appeals addressed *Levy* again in a non-precedential opinion. In *United States v. Mitan*, the Court of Appeals stated that "*Levy* crafted a three part test examining: (1) intentional government conduct, (2) attorney-client privilege, and (3) the release of confidential legal strategy. When those circumstances coalesce, *Levy* dispenses with an inquiry into whether the defense was prejudiced." 499 F. App'x 187, 192 (3d Cir. 2012). However, the *Mitan* court questioned whether the presumption of prejudice established in *Levy* even remained viable after the Supreme Court's decision in *Morrison*. *Id.* at 192 n.6. Nonetheless, *Mitan* is not binding authority. *See, e.g., United States v. James*, 928 F.3d 247, 254 n.5 (3d Cir. 2019) (explaining that two unpublished opinions of the Third Circuit do not have "any precedential effect" (citations omitted)).

Considering the precedential cases from the Supreme Court and the Third Circuit Court of Appeals, this Court concludes that a defendant may assert a Sixth Amendment violation in four different ways:

(1)  The Government plants an informer in the defense camp, *Costanzo*, 740 F.2d at 254;

(2)  Confidential defense strategy information is disclosed to the Government by a Government informer, *id.* (incorporating *Levy*);

(3)  A disclosure by a Government informer, intentional or unintentional, leads to prejudice to the defendant, *id.*; or

(4)  The Government's infringement has had or threatens some adverse effect upon the effectiveness of counsel's representation or has produced some other prejudice to the defense, meaning, "demonstrable prejudice or substantial threat thereof," *Morrison*, 449 U.S. at 365–66.

The Court's determination is in accord with other sister circuit courts of appeals to have considered this particular legal issue. For example, the Tenth Circuit Court of Appeals presumes a Sixth Amendment violation when the intrusion in attorney-client communications was deliberate and unjustified by any governmental interest but, absent that, a defendant must make a showing of prejudice.[7] The Courts of Appeals for the First, Sixth, and Ninth Circuits all require a defendant to show something beyond an intentional intrusion to allege a Sixth Amendment violation.[8] The

---

[7] *Shillinger v. Haworth*, 70 F.3d 1132, 1142 (10th Cir. 1995).

[8] *United States v. Mastroianni*, 749 F.2d 900, 907 (1st Cir. 1984) ("A Sixth Amendment violation cannot be established without a showing that there is a realistic possibility of injury to defendants or benefit to the State as a result of the government's intrusion.") (internal quotation marks omitted)); *United States v. Steele,* 727 F.2d 580, 585–86 (6th Cir. 1984) ("Even where there is an intentional intrusion by the government into the attorney-client relationship, prejudice to the defendant must be shown before any remedy is granted."), *cert. denied sub nom. Scarborough v. United States,* 467 U.S. 1209 (1984); *United States v. Glover*, 596 F.2d 857, 863–64 (9th Cir. 1979) (holding that even in the case of an intentional intrusion of the attorney-client relationship "the existence or nonexistence of prejudicial evidence derived

Courts of Appeals for the Second and District of Columbia Circuits, on the other hand, have not decided whether prejudice may be presumed in the case of an intentional intrusion, but otherwise require a showing of prejudice.[9] The Court of Appeals for the Eighth Circuit, taking a slightly different approach, requires *both* a knowing intrusion into the attorney-client relationship and, in addition, a showing of prejudice or a substantial threat of prejudice.[10] The Courts of Appeals for the Fourth and the Eleventh Circuits have, similarly, suggested that a defendant must make a showing of prejudice.[11] Thus, this Court's determination of the governing legal standard under Third Circuit precedent places it squarely in line with the other courts of appeals to have considered this question.

In sum, both parties are right to an extent. There is one circumstance (when confidential defense strategy information is disclosed by an informant) in which the court presumes prejudice, as Mr. Anand argues, but the more general rule is that a defendant must make a showing of prejudice, as the Government argues. Either way, Mr. Anand has not asserted a Sixth Amendment violation under the facts of this case.

### B. **Mr. Anand Has Not Demonstrated Any Prejudice, Threat of Prejudice, or Circumstances Requiring the Court to Presume Prejudice**

Equipped with the proper legal standard, application to the facts of this case is much more straightforward.

---

from an alleged interference with the attorney-client relationship is relevant in determining if the defendant has been denied the right to counsel"), *cert. denied*, 444 U.S. 857 (1979), *cert. denied* 444 U.S. 860 (1979).

[9] *See United States v. Schwimmer*, 924 F.2d 443, 446–47 (2d Cir. 1991) (Defendant "also contends that the intentional intrusion into the attorney-client domain that occurred when the government agents obtained the workpapers requires an automatic reversal of his conviction. Although such an intentional intrusion warrants careful scrutiny, this Circuit never has gone so far as to adopt the per se rule for which [Defendant] argues."); *United States v. Kelly*, 790 F.2d 130, 137 & n.5 (D.C. Cir. 1986).

[10] *United States v. Singer*, 785 F.2d 228, 234 (8th Cir. 1986).

[11] *See United States v. Walker*, 839 F.2d 1483, 1486 (11th Cir. 1988); *United States v. Guild*, 341 F. App'x 879, 884–85 (4th Cir. 2009).

To begin, there is no allegation by Mr. Anand nor any indication in the facts adduced at the hearing that an informer for the Government was involved. As a result, Mr. Anand cannot make a Sixth Amendment claim under any of the first three scenarios described above. *Costanzo*, 740 F.2d at 254; *see also United States v. Brodie*, 250 F. Supp. 2d 466, 469 (E.D. Pa. 2002) ("The [non-informant] context here is so different from *Weatherford* and *Costanzo* that the principles of those cases are hardly relevant.").

Mr. Anand attempts to get around this by arguing that some of the documents the Government viewed were related to a separate civil case against one of Mr. Anand's former business partners and Mr. Anand believes that this former partner was involved with the Government investigation into him. July 7, 2022 Hr'g Tr., at 169:16–170:7, Doc. No. 175. But this argument fails, too, because it is pure conjecture. Mr. Anand has not adduced any facts suggesting this to be true and, in addition, he has not suggested that this former partner either acted as a Government informer or that this former partner disclosed confidential defense strategy to the Government. *Cf. Costanzo*, 740 F.2d at 254. Of course, if facts introduced later alter this landscape, Mr. Anand has recourse to other legal remedies.

That leaves Mr. Anand with demonstrating that he suffered prejudice or the substantial threat thereof. There is no doubt that the Government has substantial room for improvement in handling investigations of this sort. Based on the facts introduced at the hearing alone, there are, quite plainly, a number of areas where the Government can and should make corrections moving forward. First, the specific instructions about the protocols to be followed during execution of the searches, established in the affidavit to the search warrant, (1) were not consistently communicated to those people involved in executing the search and (2) were not followed by those in leadership positions. For example, multiple witnesses with varying levels of responsibility—from Agent

Majarowitz coordinating all of the searches to Agent Rich reviewing the materials in the Relativity database—testified that they did not record the names of any of Mr. Anand's attorneys when they came across them despite the fact that they knew that was required by the plain language of the affidavit accompanying the search warrant.

Second, the Government had no protocol in place for anyone to review the seized hard-copy materials marked as containing potentially privileged materials in "Box 17." Agent McDonald's request of Agent Majarowitz to have Detective Snyder look through the materials was not based on any policy or procedure and also was not cleared by the United States Attorney's Office or the Department of Justice.

Third, the Government had no policy or procedure in place for the RCFL to conduct a privilege review of the seized electronic materials. This was done on a case-by-case basis and relied on the FBI case agents to effectively communicate with the RCFL, which was clearly not always done. In short, the Government had no clear and consistent policies, procedures, or protocols in place for the review and identification of potentially privileged information.

Lastly, the Government also waited five months from the time it first discovered the potentially privileged information in the seized electronic materials to alert Mr. Anand. While this, by itself, is not evidence of any nefarious actions by the Government, it further underscores the higgledy-piggledy nature of the Government's investigation in this particular case.

In sum, the Government's conduct in this case certainly falls below the high *expectations* that this Court and the people of the United States demand of its prosecutors. But just because the Court is disappointed with the Government's failure in this instance to meet the high expectations demanded of it does not mean that the Government's conduct actually caused Mr. Anand any prejudice or the threat of prejudice so as to constitute a Sixth Amendment violation.

Indeed, Mr. Anand has not specifically explained how the Government's conduct in this particular case caused him prejudice or the substantial threat of prejudice. In fact, the Court directly asked counsel for Mr. Anand what precise prejudice he had suffered, and counsel responded with the prejudice he *might* have suffered *if* Mr. Anand's former partner is, in fact, working with the Government. July 7, 2022 Hr'g Tr., at 169:16–170:7, Doc. No. 175. But, as the Court has already explained, this theory is conjecture. Plus, even if true, Mr. Anand has also not explained how the Government's viewing of documents related to that case caused prejudice or the threat of prejudice here other than a generalized assertion that such conduct is not fair. *Cf. United States v. Musto*, No. 16-cr-90, 2017 WL 1078179, at *5 (M.D. Pa. Mar. 22, 2017) (denying motion to dismiss because defendant failed to demonstrate that FBI agent flipping through privileged notebook caused any prejudice).

In short, none of the Government's actions severely intruded or threatened to intrude on Mr. Anand's Sixth Amendment right to counsel. Put informally, the Government's conduct here might be described as "no harm, no foul." Therefore, the Court finds that Mr. Anand has not alleged any Sixth Amendment violation and, as a result, denies his motion to dismiss the indictment.

## II. Even if Mr. Anand Had Alleged a Sixth Amendment Violation, Mr. Anand's Requested Remedies Would Be Inappropriate Here

Beyond his argument that he suffered a Sixth Amendment violation, Mr. Anand also asks the Court to fashion a new legal remedy and then apply it to the facts of this particular case. As counsel for Mr. Anand clarified at oral argument, Mr. Anand is asking the Court to craft a sort of "super exclusionary rule" in the Sixth Amendment context. According to Mr. Anand, the Government should not be permitted to execute a search warrant and take vast amounts of materials from a defendant only to send the materials back to the defendant and then require him

to specifically assert privilege over those materials he believes are privileged. Because the amount of material may be vast, including thousands or hundreds of thousands of documents, Mr. Anand argues, this places too much of a burden on a criminal defendant and accentuates the asymmetry of power between the Government and a defendant. July 7, 2022 Hr'g Tr., at 166:2–167:22, 170:1–7, Doc. No. 175. Thus, Mr. Anand's solution is that the Government should be required to either search much more narrowly or, if engaging in a broad search, put better policies and procedures in place to screen for potentially privileged materials. But Mr. Anand's theories are untenable.

As to his first idea, it is true that the Government often seizes much more material pursuant to a search warrant than will ultimately be used at trial. But that does not mean the Government may seize materials indiscriminately. Instead, the search and seizure attendant to execution of a warrant is still proscribed by both the requirement that a warrant be based on probable cause and that it state its objects with particularity. *United States v. Tracey*, 597 F.3d 140, 147 (3d Cir. 2010) (explaining the requirements for search warrants seeking to satisfy the particularity requirement by reference to incorporated affidavits); *United States v. Yusuf*, 461 F.3d 374, 390 (3d Cir. 2006) (explaining probable cause standard for search warrants and noting that it "does not require absolute certainty that evidence of criminal activity will be found at a particular place, but rather that it is reasonable to assume that a search will uncover such evidence"). Thus, Mr. Anand's first concern is allayed by existing rules. Requiring greater particularity to the degree of pinpoint specificity in a warrant and subsequent seizure would, in reality, create a standard of clairvoyance: it would require the Government to know in advance what it does not know. The Court declines to adopt this approach.

Mr. Anand's second theory fares no better. There is no doubt that the Government can and should have systems in place to screen for potentially privileged information. And there is no doubt

ample room for improvement in the Government's policies and procedures here. But as Mr. Anand frames it, the Government should either have systems in place to conduct a nearly perfect privilege review or, if it is unable to do so, not bring charges against defendants whose cases require extensive review of documents and defendants to assert privilege. Put more colloquially, Mr. Anand advances a "too big to indict" model—if there is too much evidence for the Government to comb through to near perfection and the defendant is required to assert privilege as part of that process, Mr. Anand posits that the Government should not be able to bring charges at all. The Court declines to adopt this incredibly expansive reading of Sixth Amendment that would, in effect, unconditionally shield the wrongdoers who have amassed the most paperwork.

Moreover, Mr. Anand has cited no legal authority for his position because he is asking this Court to create a remedy that the Supreme Court has been unwilling to create. As the Supreme Court explained, the remedy "should be tailored to the injury suffered" and be "limited to denying the prosecution the fruits of its transgression." *Morrison*, 449 U.S. at 364, 366. Mr. Anand would seek to prevent any injury by denying the prosecution any fruits from the get-go. In other words, his requested remedy is vastly out of proportion to any theoretical injury here. *Brodie*, 250 F. Supp. 2d at 469.

The excessiveness of Mr. Anand's proposed remedy is even more apparent in relation to his central request, dismissal of the Government's indictment. That is because dismissal of an indictment is already an "extreme remedy," *United States v. Solnin*, No. 19-cr-40, 2015 WL 6442361, at *9 (E.D.N.Y Oct. 23, 2015), reserved for rare circumstances. *See, e.g.*, *Levy*, 577 F.2d at 211 (ordering dismissal of indictment after government informer disclosed confidential defense strategy to the Government); *United States v. Bohl*, 25 F.3d 904, 914 (10th Cir. 1994) (dismissing the indictment because of the government's intentional destruction of potentially exculpatory

evidence); *see also Morrison*, 449 U.S. at 365 ("[D]ismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate."); *California v. Trombetta,* 467 U.S. 479, 486–87 (1984) (noting that dismissal of the indictment might be appropriate when the Government permanently loses potentially exculpatory evidence). Indeed, the Supreme Court has noted that the dismissal of an indictment for a Sixth Amendment violation is the exception, not the rule. Citing famous examples of cases involving Sixth Amendment violations, *Gideon v. Wainwright* and *O'Brien v. United States*, the Supreme Court noted that even in those cases, where a criminal defendant was denied *all* counsel and where law enforcement overheard privileged pretrial conversations between a defendant and his lawyer, respectively, "[n]one of these deprivations . . . resulted in the dismissal of the indictment." *Morrison*, 449 U.S. at 365.

Here, as described above, Mr. Anand has failed to assert a Sixth Amendment claim at all. But, even if he had, the Court would only dismiss an indictment under analogously extreme circumstances. Mr. Anand has not alleged anything of the sort.

Finally, Mr. Anand argues in the alternative that the Court should dismiss the current prosecution team. To be sure, that is an available remedy, but it, too, is a severe one. A district court's decision to disqualify a prosecution team involves balancing competing concerns. On the one hand, the court risks invading the separation of powers by reaching into the executive branch; on the other hand, the court must be vigilant to protect the defendant's right to counsel and right to a fair trial. *See United States v. Whittaker*, 268 F.3d 185, 193–94 (3d Cir. 2001); *United States v. Bolden*, 353 F.3d 870, 879 (10th Cir. 2003). This involves a case-by-case analysis and should be "a measure of last resort." *In re Grand Jury Proceedings*, 859 F.2d 1021, 1026 (1st Cir. 1988). For example, one district court ordered the dismissal of the prosecutor where she had ordered a discovery contractor to make duplicate copies of any documents requested and viewed by a defense

team, which the court found to be an intentional intrusion of the work product doctrine. *United States v. Horn*, 811 F. Supp. 739, 741–43, 752 (D.N.H. 1992), *rev'd in part,* 29 F.3d 754 (1st Cir. 1994). By contrast, the Third Circuit Court of Appeals overturned a district court's dismissal of the prosecution team in a case involving a chop-shop scheme where the Government inadvertently sent a letter requesting a victim impact statement to the defendant, among 300 others. *United States v. Whittaker*, 268 F.3d 185, 187 (3d Cir. 2001). In that case, the Third Circuit noted that "[t]he worst thing that can be said about [the Assistant U.S. Attorney] in particular and the United States Attorney's office in general is that they were negligent." *Id.* at 194.

Here again, Mr. Anand has not asserted a viable Sixth Amendment claim. But, even if he had, the Government's conduct here was, at worst, negligent, and would not merit the alternative remedy he requests either. *Id.*

CONCLUSION

There is no doubt that the Government made mistakes in conducting its privilege review. But the Government's mistakes do not rise to the level of a Sixth Amendment violation and, even if they did, they do not require the remedies Mr. Anand demands. As such, the Court denies Mr. Anand's motion to dismiss the indictment.

BY THE COURT:


 /s/ Gene E.K. Pratter
**GENE E.K. PRATTER**
**UNITED STATES DISTRICT JUDGE**