IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| V. | : | No. 19-cr-00518-001 |
| | : | |
| | : | |
| NEIL K. ANAND | : | |

Neil K. Anand's Motion to Suppress
Physical Evidence and Request for a *Franks* Hearing

COMES NOW, Neil K. Anand, defendant, by and through his counsel, Coley O. Reynolds, Esquire, pursuant to Fed. R. Crim. P. 12(b) and the Fourth Amendment to the United States Constitution, respectfully moves the Court to suppress all evidence relating to Patient F.H. and all other medical records seized by law enforcement as a result of the August 20, 2019, search warrant for DrChrono. In the case of F.H., the evidence was seized as result of a warrantless search.  In the case of medical records seized pursuant to the August 20, 2019 search warrant, the evidence was recovered as a result of a defective search warrant, obtained when law enforcement omitted information from the search warrant affidavit that would have negated the finding of probable cause. As a result, the evidence must be suppressed. In addition, Dr. Anand respectfully requests that the Court find that he is entitled to a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).

WHEREFORE, for the reasons set forth in the accompanying Memorandum of Law, as well as any which may become apparent at a hearing or the Court deems

just, Dr. Anand respectfully requests that the Court grant his Motion, and suppress the evidence relating to Patient F.H. and the medical records seized by law enforcement following their August 20, 2019 search warrant for DrChrono. Dr. Anand requests a *Franks* hearing, and he respectfully reserves the right to supplement his motion to suppress based on additional facts that may be developed during a hearing on this matter.

<div style="margin-left:40%">

Respectfully submitted,

Reynolds Firm, LLC

</div>

Dated: October 16, 2023          By:  _/s/ Coley O. Reynolds_
                                 By: Coley O. Reynolds, Esquire
                                 Counsel for Neil K. Anand, Defendant
                                 PA Atty ID No.: 87923
                                 121 S. Broad Street, Suite 1200
                                 Philadelphia, PA 19107
                                 267-710-1177
                                 cor@reynoldsfirm.com

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| V. | : | No. 19-cr-00518-001 |
| | : | |
| | : | |
| NEIL K. ANAND | : | |

Memorandum Of Law In Support Of
Neil K. Anand's Motion to Suppress
<u>Physical Evidence and Request for a Franks Hearing</u>

Neil K. Anand ("Anand"), has moved the Court for an Order suppressing the evidence relating to Patient F.H. and evidence seized by law enforcement as a result of the August 20, 2019, search warrant. The affidavit for the search warrant omitted key, relevant information, either designed to mislead or made in reckless disregard for the truth, that the court relied on in finding probable cause. This omitted information would have negated the finding of probable cause. As a result, this omission was a violation of the Fourth Amendment and cannot be saved by a good faith exception. As a result, all evidence relating to Patient F.H., and all evidence seized by law enforcement as a result of the August 20, 2019 search warrant, should be precluded from admission at trial.

*Background*

According to the indictment and other available information, it is alleged that Dr. Anand unlawfully prescribed controlled substances to patients by prescribing those medications outside the usual course of professional practice and

without a legitimate medial basis and with unlawfully billing for those allegedly unnecessary services. During its investigation into Dr. Anand, the government interviewed patients and employees, both present and prior.  The government also executed several search warrants.  Relevant to this motion is the search and seizure of DrChrono records by the government both after the issuance of a search warrant.

On May 7, 2019, law enforcement agents interviewed F.H. During that interview, agents asked F.H. questions about his treatment by Dr. Anand. According to the Report of Interview, F.H. was asked "about prescriptions he received from Dr. Neil Anand ... without a corresponding office visit in the April/May 2016 time frame."  See "Exhibit A," attached.

On August 20, 2019, the government presented a application for a search warrant for Dr. Anand's DrChrono records.

It is presented to this Court that the only way the agents could have known there was not a "corresponding office visit in the April/May 2016 time frame" would have required access to patient medical records. However, the government did not have access to the records of Dr. Anand's patients until after the August 20, 2019 application for search warrant of his medical records.

Dr. Anand retained the services of a computer forensics expert to investigate illegal access to his medical records on DrChrono.  The forensic evaluation identified unusual and illegal access of DrChrono beginning in October 2017. Specifically, the examination found the following:

2

A.  On January 12, 2019, a rogue person changed information in the DrChrono records without authorization.  As indicated in the attached declaration, (See "Exhibit B," attached), January 12, 2019 was Dr. Anand's daughters 1st birthday. An investigation revealed that at the time of the rogue hack into the DrChrono system, Dr. Anand was driving his vehicle, picking up food and at the party.

B.  On September 25, 2019, Dr, Anand was arrested and held in custody until October 1, 2019.  During this time, there was another rogue hack on the DrChono system, when an unauthorized person logged onto the system and made modifications to the medical records.

C.  On January 4, 2020, investigation showed Dr. Anand was at home.  At the same time, another rogue hack occurred on the DrChrono System when an unauthorized user accessed the system and made modifications to a key government witnesses medical records ("T.R.").  As indicated in the Exhibit B, there was no corresponding office visit for "T.R." that day. Further a comparison of the medication records from DrChrono and those of the government provided in discovery for this same visit shows discrepancies in the medication provided to "T.R."

3

On January 1, 2022, Dr. Anand reported to the Bensalem Police Department that his medical records had been electronically hacked. The Bensalem Police Department conducted a limited investigation into the breach.  Researching 30 of the IP addresses that were used to breach Dr. Anand's medical records, the police department determined that the IP addresses came from "all across the United States to different areas with different internet providers."  See "Exhibit C," attached.

Further review of the DrChrono records provided in discovery showed that Maria Costanzo, an employee of Dr Anand's accessed and made entries in various patient charts from November 23, 2018 to December 30, 2018. All of the entries are after office hours. However, the attached affidavit from Ms. Costanzo states that she did not access those charts at those times, nor while at home.   See "Exhibit D," attached.

*Discussion*

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  The essential purpose of this amendment is to "impose a standard of reasonableness upon the exercise of discretion by government officials, including law enforcement agents, in order to safeguard the privacy and security of individuals against arbitrary invasions . . . ." *Delaware v. Prouse*, 440 U.S. 648, 653-54 (1979) (citations and quotations omitted).  "Thus, the

permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests. Id. at 654.

The Fourth Amendment's Warrant Rule was crafted to provide two distinct constitutional protections: "First, the magistrate's scrutiny is intended to eliminate altogether searches not based on probable cause. . . . The second, distinct objective is that those searches deemed necessary should be as limited as possible." *Coolidge v. New Hampshire*, 403 U.S. 443, 467(1971). Additionally, pertaining to warrants, the Fourth Amendment requires a warrant to be issued by a neutral and detached magistrate upon a finding of probable cause and supported by oath or affirmation. See *United States v. Zimmerman*, 277 F.3d 426, 436-37 (3d Cir. 2002). This warrant's validity must be assessed on the basis of the information that the officers disclosed, or had a duty to discover and disclose to the issuing magistrate. *Maryland v. Garrison*, 480 U.S. 79, 85 (1987); see *United States v. Ritter*, 416 F.3d 256, 266 (3d Cir. 2005).

*Standing*

Dr Anand has a reasonable expectation of privacy in the DrChrono records and, therefore has standing to challenge the warrant in this matter. "The rights assured by the Fourth Amendment are personal rights, [which]... may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure." *Simmons v. United States*, 390 U.S. 377, 389 (1968). To assert standing to suppress evidence, a defendant must have "a

legitimate expectation of privacy in the invaded place" or the item seized. *Rakas v. Illinois*, 439 U.S. 128, 143 (1978); see *United States v. Rusher*, 966 F.2d 868, 873-74 (4th Cir. 1992). Thus evidence seized pursuant to a warrantless search and without probable cause will be suppressed only if there is an encroachment upon a legitimate expectation of privacy. See *California v. Greenwood*, 486 U.S. 35, 39 (1988). A legitimate expectation of privacy exists when the individual seeking Fourth Amendment protection maintains a "subjective expectation of privacy" in the area searched that "society [is] willing to recognize... as reasonable." *California v. Ciraolo*, 476 U.S. 207, 211 (1986); *see Oliver v. United States*, 466 U.S. 170, 177-78 (1984) (explaining that the legitimacy of a reasonable expectation of privacy under the Fourth Amendment is determined by "our societal understanding").

Several courts have held that a physician who owns and operates a medical practice and maintains the medical records has a legitimate expectation of privacy in patient records. In *United States v. Gosy,* No. 16-CR-46G, 2018 WL 8120791 (W.D.N.Y. Dec. 13, 2018), a physician was found to have an expectation of privacy, *inter alia*, in search of the computers belonging to a third party which were used as "online backup storage of his office and patient records." *Id.* at *9. *Gosy* concluded the defendant had "a reasonable and legitimate expectation of privacy in the medical records of his patients and office records as well as the storage of those records in the backup computers." *Id.* at 10. As such, the physician had standing to challenge the search warrant. *Id. See also: United States v. Wetselaar,* No. 2:11-CR-00347-KJD, 2013 WL 8206582 (D. Nev. Dec. 31, 2013)(holding that a physician had

standing to challenge the seizure of patient medical records "because he is not only the sole owner, but also the only physician in the practice, manages and controls the entire business, and has access to the entire medical office." *Id*. at*5.).

In *United States v. Newman,* No. 3:19-CR-59-TAV-DCP, 2020 WL 7384864 (E.D. Tenn. Sept. 8, 2020), *report and recommendation adopted,* No. 3:19-CR-59-TAV-DCP, 2020 WL 6938815 (E.D. Tenn. Nov. 25, 2020), the court held that a physician had standing to challenge a search warrant which authorized seizure of patient medical records. In *Newman* the defendant physician managed, controlled and was the majority owner of the practice. *Id.* at *7.  While the doctor in *Newman* did not create the patient files, he did, however, have a duty to oversee and maintain the records. *Id.*  With this in mind, *Newman* found: "In summary, ... [the defendant ] owned the commercial premises that was searched, had a subjective expectation of privacy in [the patient records] and his subjective expectation was objectively reasonable." *Id.*

In *United States v. Pompy,* No. 18-CR-20454, 2021 WL 978797 (E.D. Mich. Mar. 16, 2021), the court also found that a physician had standing to challenge the seizure of patient medical records.  Using *Newman* in its analysis*, Pompy* found the "[d]efendant has a legitimate expectation of privacy in his patients' medical records, because he prepares and maintains them." 2021 WL 978797, at *3 (*citing and quoting United States v. Newman,* No. 3:19-CR-59-TAV-DCP, 2020 WL 7384864, at *7 (E.D. Tenn. Sept. 8, 2020), *report and recommendation adopted,* No. 3:19-CR-59-TAV-DCP, 2020 WL 6938815 (E.D. Tenn. Nov. 25, 2020). In finding a reasonable

expectation of privacy in the medical records, and therefore standing to challenge the seizure, *Pompy* also noted that the records were password protected and that only the physician and his staff had the records. 2021 WL 978797, at *3.

In the present matter, Dr. Anand owned and operated the practices at issue here. He was the sole owner of the practices. *United States v. Gosy,* No. 16-CR-46G, 2018 WL 8120791 (W.D.N.Y. Dec. 13, 2018).  The records, stored on DrChrono, were password protected and only he and his staff had the password. *United States v. Pompy,* No. 18-CR-20454, 2021 WL 978797 (E.D. Mich. Mar. 16, 2021). Dr. Anand, while not the only person who enters information into DrChrono, is the sole person responsibility with maintaining the records. *United States v. Newman,* No. 3:19-CR-59-TAV-DCP, 2020 WL 7384864 (E.D. Tenn. Sept. 8, 2020); *United States v. Pompy,* No. 18-CR-20454, 2021 WL 978797 (E.D. Mich. Mar. 16, 2021) *See also:* 49 Pa. Code §16.95 - Medical Records (under Pennsylvania law, a physician is required to maintain patient records).

Dr. Anand has a reasonable expectation of privacy in the medical records of his patients, and therefore, has standing to challenge the warrant authorizing the seizure of those records.

### *Evidence of F.H. Should be Suppressed*

The evidence of F.H.'s medical treatment should be suppressed. As shown above, law enforcement knew prior to the May 7, 2019 interview that F.H. received prescriptions from Dr. Neil Anand. Further, they knew he had done so (allegedly)

without a corresponding office visit.  Finally, they knew the prescriptions were written in April/May 2016 time frame. It is submitted to this Court that law enforcement could only have known this much detailed information by reviewing F.H.'s medical records. There exists no search warrant for medical records related to F.H. issued prior to the May 7, 2019 interview. As such, there is only one conclusion the Court can make, that agents accessed, without a warrant, medical records associated with F.H. and therefore, this evidence should be suppressed.

### Records Seized with the
### August 20, 2019 Search Warrant Should be Suppressed

The confidential medical records seized from DrChrono with the August 20, 2019 search warrant should be suppressed as law enforcement omitted from the affidavit the illegal activity related to the interview of F.H. The search warrant, attached as "Exhibit D," would have been denied by a neutral and detached magistrate had the government not omitted the egregious conduct of accessing F.H.'s medical records with out a warrant.

### Exclusionary Rule Requires Suppression Of Evidence

Generally, the fruits of a search unsupported by probable cause must be suppressed pursuant to the exclusionary rule. See *Wong Sun v. United States*, 371 U.S. 471 (1963). Evidence will not be suppressed, however, when officials acting in good faith reasonably rely on a warrant that is later determined to be invalid for a lack of probable cause. See *United States v. Leon*, 468 U.S. 897, 922 (1984); *United States v. Vasquez-Algarin*, 821 F.3d 467, 483 (3d Cir. 2016). But the Third Circuit

has recognized that the good-faith exception must be strictly circumscribed to prevent it from swallowing the exclusionary rule:

> When the Supreme Court announced the good faith exception in Leon, it weakened the exclusionary rule, but it did not eviscerate it. Good faith is not a magic lamp for police officers to rub whenever they find themselves in trouble.

*United States v. Zimmerman*, 277 F.3d a426, 437-38 (3d Cir. 2002) (internal quotations and citations omitted). Rather, courts must "enforce the exclusionary rule where law enforcement officers, at the time they acted, would have or should have known their [conduct] w[as] unconstitutional." *Vasquez-Algarin*, 821 F.3d at 484 (internal quotation and citation omitted).

The Third Circuit has held: "(1) omissions are made with reckless disregard for the truth when an officer recklessly omits facts that any reasonable person would want to know; and (2) assertions are made with reckless disregard for the truth when an officer has obvious reasons to doubt the truth of what he or she is asserting." *Wilson v. Russo*, 212 F.3d 781, 783 (3d Cir. 2000). Here, law enforcement acted with reckless disregard for the truth when they omitted from the affidavit the warrantless search of medical records maintained by Dr. Anand prior to the issuance of the August 20, 2019 search warrant.

However, even when a Fourth Amendment violation occurs, such as in this case, exclusion may not be required. *Davis v. United States*, 131 S. Ct. 2419, 2426 (2011) (quoting Stone v. Powell, 428 U.S. 465, 486 (1976)) (internal quotation marks omitted)("exclusion is not a personal constitutional right, nor is it designed to redress the injury occasioned by an unconstitutional search."). This is because the

Exclusionary Rules "sole purpose . . . is to deter future Fourth Amendment violations." *Id.*  When the application of the Exclusionary Rule "does not result in appreciable deterrence" then exclusion is "unwarranted." *United States v. Janis*, 428 U.S. 433, 454 (1976).  Further, the court must apply a balancing test to determine if exclusion outweighs the heavy costs. *Davis*, 131 S. Ct. at 2427 ("for exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs.").

The balancing test should look to the nature of the police conduct. "When law enforcement officers exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong." *Davis*, 131 S. Ct. at 2427.

Here, law enforcement exhibited deliberate disregard for Dr. Anand's Fourth Amendment rights by the warrantless search of private patient medical records prior to the issuance of a search warrant.  The need to deter such egregious conduct in the future far outweighs the cost in this matter that the Court must exclude the evidence and suppress the seized items as "fruit of the poisonous tree." *United States v. Brown*, 448 F.3d 239, 244 (3rd Cir. 2006), citing *Wong Sun v. United States*, 371 U.S. 471, 487-488 (1963).

### *Franks Hearing Request*

"The right to a *Franks* hearing is not absolute." *United States v. Pavulak*, 700 F.3d 651, 665 (3d Cir. 2010).  To make a showing that a *Franks* hearing is

required, the movant must (1) make a "substantial preliminary showing" that the affiant knowingly or recklessly included a false statement in, or omitted facts from, the affidavit; and, (2) demonstrate that the false statement or omitted facts are "necessary to the finding of probable cause." *Id.*, *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978).

Franks analyzed the issue of suppression as it pertained to a defendant's right to challenge a search warrant. 438 U.S. 154 (1978). *Franks* developed a two-prong test for when a defendant challenges a search warrant and the statements contained in the attached affidavit. *Id.* at 155-156. The first prong requires a defendant to show that "a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." *Id.* The second prong requires the defendant to show that without the false or recklessly included material, probable cause would not have been established. *Id.* at 156. Both prongs must be proved by a preponderance of the evidence standard. *Id. See also: United States v. Gordon*, 664 Fed.Appx. 242,245 (3d Cir. 2016)(if a defendant fails to make that showing with respect to either prong, the defendant is not entitled to a hearing).

In addressing omissions from affidavits, *Franks* "protects against omissions that are designed to mislead, or that are made in reckless disregard of whether they would mislead the magistrate." *Id.* at 301. This omission must be necessary to the finding of probable case. *Id. See also*: *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990)(*Franks* appropriate when an agent omits relevant facts from the

affidavit). Here, Dr. Anand has provided a substantial preliminary showing that the affiant knowingly or recklessly omitted facts from the affidavit, that is, the illegal intrusion into "F.H.'s" medical records; and, (2) Dr. Anand has demonstrated that the or omitted facts would have rebutted the finding of probable cause. As such, the Court should grant the request for a *Franks* hearing.

<u>*Conclusion*</u>

WHEREFORE, Defendant, Neil K. Anand, for all of the foregoing reasons, respectfully requests this Honorable Court grant his motion and suppress evidence pertaining to Patient F.H. and the evidence seized by law enforcement as a result of the August 20, 2019 search warrant and attached affidavit from evidence in this matter. Further, he requests a *Franks* hearing.

Respectfully submitted,

Dated: October 16, 2023         By: ___*/s Coley O. Reynolds*___
                                Coley O. Reynolds, Esquire
                                PA Atty ID No.; 87923
                                121 S. Broad Street, Suite 1200
                                Philadelphia, PA 19107
                                cor@reynoldsfirm.com
                                267-710-1176

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| V. | : | No. 19-cr-00518-001 |
| | : | |
| | : | |
| NEIL K. ANAND | : | |

Order

AND NOW, this        day of             , 2023, upon consideration of Neil K.
Anand's Motion to Suppress, the Memorandum in Support thereof, and the entire
record in this matter, it is ORDERED that Defendant Anand's Motion is granted. It
is ORDERED the evidence pertaining to Patient "F.H." and the evidence seized by
law enforcement as a result of the August 20, 2019 search warrant and attached
affidavit is HEREBY suppressed and precluded from trial in this matter.

By the Court:

_____
HON. GENE E.K. PRATTER
Judge, United States District Court

 

**Department of Health and Human Services**

## OFFICE OF INSPECTOR GENERAL
### OFFICE OF INVESTIGATIONS

---

### REPORT OF INTERVIEW

███████ was interviewed on 5/7/2019 by Special Agents Paul Rich (HHS-OIG) and Tim Handley (USPS-OIG). After being advised of the nature of the interview and the identity of the interviewers, ███████ provided the following information, in substance:

███ injured his back in 1992 after he slipped on a newly waxed floor. At the time of his injury ███████ was employed at the United States Postal Service (USPS) bulk mail center on Byberry Road. Hand sought treatment for his injury from Dr. Richard Kaplan (Kaplan). Dr. Kaplan's office is located at 9140 Academy Road, Philadelphia, PA 19114. Hand still receives benefits from the Department of Labor, but is no longer employed by the USPS.

███ was asked about prescriptions he received from Dr. Neil Anand (Anand) without a corresponding office visit in the April/May 2016 timeframe. ███ explained that Kaplan brought in other physicians to assist with the treatment of his patients. For a short period of time Kaplan had a physician of Middle Eastern descent working at the practice.

SA Handley showed ███ a picture of Anand. Initially, ███ was not sure if the picture was of the same person he met at Kaplan's practice, but stated that it could be him. Shortly after seeing the picture ███ recalled additional details of his interactions with Anand.

Anand was trying to push additional services onto ███ at a different practice. Specifically, Anand wanted ███ to get injections at Anand's practice, which may have been located in Roxborough. For these reasons ███ did not like being seen by Anand. ███ was treated by Anand between two and five times at Kaplan's practice. ███ never received any injections from Anand.

| Interview Conducted on | 5/7/2019 | | At | ████████ | | |
|---|---|---|---|---|---|---|
| By | Paul Rich (HHS-OIG) and Tim Handley (USPS-OIG) | | | | Inv. Phone Number | |
| Date(s) Prepared | 5/9/2019 | | By | Paul Rich | | Case Number  3-17-0-0171-9 |

This document, including any attachments and information contained therein, is the property of HHS OIG and is for OFFICIAL USE ONLY. The original and any copies of the report must be appropriately controlled and maintained. Disclosure to unauthorized persons without prior written approval of the Deputy Inspector General for Investigations or his/her designee is strictly prohibited and may subject the disclosing party to liability. Unauthorized persons may include, but are not limited to, individuals referenced in the report, contractors, and individuals outside the HHS. Public disclosure is determined by the Freedom of Information Act (Title 5, U.S.C., Section 552) and the Privacy Act (Title 5, U.S.C., Section 552a).

OI-3  (09/2014)

Report of Interview – ███████                          Page **2** of **2**
Date of Interview:  5/7/2019                           Case Number: 3-17-0-0171-9

When asked specifically about the three prescriptions he received from Anand while being
treated at Kaplan's office, ████ replied that he was taking Oxycontin 60mg tablets three times
per day, and using 10mg Oxycodone for break through pain management. ████ used Wellness
First pharmacy in Elkins Park for his prescriptions during this period in time, although he no
longer uses Wellness First. ████ would personally pick up his prescriptions.

INT_000095

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| United States of America, | : | |
| | : | |
| v. | : | **Case No. 2:19-cr-00518** |
| | : | **DECLARATION OF** |
| D-1. Neil K. Anand. | : | **ANDREW GARRETT** |
| | : | |
| | : | |

Andrew Garrett, being duly sworn, deposes and says:

**<u>My knowledge and experience in EMR systems</u>**

1.      I am a digital forensic expert who has an extensive background in Electronic Medical Records (EMR)/Electronic Health Records (EHR).  I previously worked for the Illinois government Health Information Technology Project Office implementing the Department of Health and Human Services (DHHS) Medicare and Medicaid EHR Incentive Programs (now known as the Promoting Interoperability Programs).  As a digital forensic expert, I have testified in more than 180 cases in over 24 states in both state and federal courts.  I have served as an expert in over 30 cases involving EMR discovery.  I have worked as an expert assisting parties in obtaining EPIC audit trails, and performed subsequent analysis of those audit trails, numerous times.  I have specifically previously been found qualified as an expert in the Commonwealth of Kentucky.  Attached as Exhibit 1 is my prior affidavit in this matter which includes my *curriculum vitae*.

2.      Until a few years ago there was no formal digital forensics degree offered and my education is through experience and through more than 35 training courses at schools regarding the forensics analysis of computing hardware and software.

3.      I have a firm understanding of the auditing within Dr. EMR system.

<div align="center">Exhibit B</div>

4.      I have for the past 5 years worked with vendors whom write code to integrate numerous EMR systems to create audit trail queries, test and train.

5.      I have conducted more than 45 inspections of EMR systems ordered by the court or by agreement of the parties.  A list of my EMR inspection history is attached as Exhibit 2.  Of these, about a dozen involved the EPIC EMR system, specifically.  I note that there are some inspections that I have conducted that are under seal, and, thus, I cannot list them here.

6.      Because of my education and training (which I will describe further below), and my experience in the cases in which I have conducted live inspections of an EMR system, I have always been able to easily access the information that my client is seeking, including, amongst other things, audit trails and note revision histories.

7.      Attached as Exhibit 3 is a list of cases in which I have testified over the past two years regarding EMRs.  Overall, I have testified 11 times on the subject of EMRs.

8.       In the last two years alone, I have testified at trial in Cook County, Illinois (*Evans v The Ingalls Memorial Hosp., et al.*, Case No.: 17 L 13276); Marin County, Florida (*Greer, et al. v Martin Memorial Medical Center, Inc., et al.*, Case No.: 19-CA-000015); Sacramento County, California (*Williams, et al. v HCR Manorcare, Inc., et al.*, Case No.: 34-2019-00257697); and St. Lucie County, Florida (*Fabian, et al. v HCA Health Services of Florida, Inc.*, Case No.: 2019-CA-000152AXXXHC).

9.      In any case, my staff at Garrett Discovery includes a former EMR trainer and physician, Dr. Steven Ariss, who I routinely work with on cases.  My staff also includes nurses who have practical experience with the use of EMR's in their prior positions.

10.      Furthermore, I am a forensic expert whose work involves all manner of various computer programs.  There is no requirement in my field that I have to be "certified" on each and

every computer program I may analyze.  For example, if I testify in court regarding a forensic analysis that I conduct on data from an application such as TikTok, a video sharing application, I do not have to be "certified" in TikTok specifically to be able to give that testimony.  The education and certifications I hold in digital forensics are sufficient to analyze various applications and programs and the data held within those applications.  Most computer programs and applications (including cell phone applications) store metadata (the equivalent of audit data in the EMR system) which tracks what a user did in the program and when, and part of my job is to access and analyze that data.  In fact, I am aware as part of my prior work with DHHS that transaction level audit data (metadata) contained in EMR systems is required to track and maintain pursuant to HITECH Act, ASTM2147-18, FDA Regulations and the Cures Act.

11.     In my time in the field of forensic analysis, I have read numerous EMR user guides and manuals, studied with training videos which are publicly available, participated in blogs and forums regarding, worked with consultants' side-by-side during court-ordered inspections, wrote queries, tested queries and formulated and executed discovery plans to obtain necessary patient data by either using EMR's myself or instructing the defendant on how to navigate the EMR.

12.     I have analyzed the data held in the Dr. Chrono EMR system used by Dr. Anand, its audit trails and patient records.

13.     I have also worked with defendant hospitals and clinics throughout the United States, (including, amongst others, Decatur Memorial Hospital in Decatur, Illinois; HSHS Medical Group in Illinois; Joe Banks APRN Family Clinic in Whitesburg, Kentucky; Beverly Hills Wellness in West Palm Beach, Florida; and Eastern Kentucky Tender Care Pediatrics in Prestonsburg, Kentucky) to instruct and support their staff regarding the use of EMR systems, and to help compile training materials and training workshops for staff regarding the EMR.

## Timeline of Events

The following timeline of events are important to understand the significant events relevant to this report and future reports regarding access to the EMR and attribution to users of the EMR system. The dates below are stored in YYYYMMDD format.

20181025 FBI Interview of Patient 7
20190112 Clinical notes changed by rogue person
20190112 Anand GPS Records from Google
20190508 FBI Interview of Patient 3
20190509 FBI Interview of Patient 2
20190522 FBI Interview of Patient 4
20190603 FBI Interview of Patient 1
20190603 FBI Interview of Patient 5
20190606 FBI Interview of Patient 6
20190708 FBI Interview of Employee 2
20190716 FBI (2nd) Interview of Employee 2
20190716 FBI Interview of Employee 1
20190722 Subpeona to Dr. Chrono and was denied and required a Search Warrant
20190722 FBI Stated this is last date of login for Dr. Anand

20190730 FBI (2nd) Interview of Employee 1
20190730 FBI Subpeona to Dr. Chrono (date estimated)
20190820 Application for Search Warrant
20190925 Dr. Anand Arrested and taken into custody
20190925 Dr. Anand Held in Jail
20190926 Dr. Anand Held in Jail
20190927 Dr. Anand Held in Jail
20190928 Dr. Anand Held in Jail
20190929 Dr. Anand Held in Jail
20190930 Dr. Anand Held in Jail
20190930 Change in EMR by Rogue Person
20191001 Dr. Anand Released from Jail
20200104 Changing of records of government witness

### Analysis of Dr. Chrono EMR System

I logged into Dr. Chrono EMR system using administrative credentials established by the defendant.   I verified that the login created gave me full and complete access to the EMR audit trails.   I was able to view the audit trails for entries into the medical records and although there are hundreds of thousands of entries, I will below show some sample entries that put all EMR data into question as to attribution to the defendant.

### January 12, 2019

On January 12, 2019 it was the Defendant Dr. Anand's daughter's 1st birthday.   I investigated this and found that there are GPS logs showing Dr. Anand driving his vehicle, pictures of him at the party and even a catering receipt showing the time of food pickup, on the way to his daughter's party.

Someone using Dr. Anand's credentials 'cardiacgasman' had logged into the EMR system at the same time he was driving and picking up the food and created and changed medical records.

| 1/12/2019 12:21 | | Dr. Neil Anand, M.D. | Vital Flowsheet |
| 1/12/2019 12:21 | Bao Jia Shi | Dr. Neil Anand, M.D. | Clinical Note |
| 1/12/2019 12:21 | Bao Jia Shi | Dr. Neil Anand, M.D. | Clinical Note |

| Create | Create Vital Flowsheet: Created/Updated Initial Groups and Vitals. 2060: [13987, 13988, 13989, 13990, 13991, 13992, 13993, 13994, 13995, 13996, |
| Update | Update Clinical Note: Clinical note set html template; note html template changed; from [clinical/2019/01/note_21765_114130160_cdcae17d-b6d |
| Update | Update Clinical Note: Clinical note set html template; note html template changed; from [clinical/2019/01/note_21765_114130160_497d0d84-53c |

Below is the GPS data obtained from Google for the account 'cardiacgasman@gmail.com' showing Defendant Dr. Anand traveling while changes were being made to the EMR system.



**September 25, 2019**

On the morning of September 25, 2019 Defendant Dr. Anand was arrested and taken into custody. He was separated from his mobile phone and placed in cuffs and transported eventually to a detention facility and held until he was released on bail on October 1st, 2019.

During the time Defendant Dr. Anand was in detention someone used his login and was able to gain access to the Dr. Chrono EMR system and make modifications to the medical records.   It would not have been possible for Dr. Anand, to either access or modify medical records, as he was in a detention facility.  Below is one of many medical record changes while Dr. Anand was in custody.



**January 4, 2020**

On January 4, 2020 GPS records show that Defendant Dr. Anand was home. That day an unknown person accessed the Dr. Chrono EMR system and made modifications to the government's key witness, ████████████ medical record. Dr. Chrono EMR system recorded a change to the medication, Nitrofurantoin, with a prescription date of 9/20/2018 entered on 1/4/2020 after Dr. Anand's indictment. Below is the active medication orders and date of logged changes.



Below, according to the Appointment Log on Dr. Chrono there was no office appointment on 9/20/2018, but office appointments listed on 9/12/2018 and on 10/9/2018.



The medication list of 1/4/2020 was compared with copies of Dr. Chrono EMR records, attached as Exhibit 4, sent by Dr. Anand's office to GEICO.  From government discovery as obtained from GEICO Records Custodian, Patricia Wiles on 9/3/2019 attached as Exhibit 5, EMR medication list for ████████ on 09/12/2018 (Response_001344) shows no nitrofurantoin and EMR medication list for ████████ on 10/9/2018 (Response_001351) shows no nitrofurantoin. Based on the IP address logged, someone logged into the EMR and made changes from an IP address that is not the IP address belonging to Dr. Anand's home while his GPS shows him at his home.



**Opinion**

Based on the above facts it is my opinion that an unknown person not Defendant, Neil Anand, has been accessing the EMR system and making changes to patient medical records.

Dated: September 23, 2022

Andrew Garrett

STATE OF FLORIDA        )

COUNTY OF ORANGE        )

On the 23[th] day of September in the year of 2022 before me, the undersigned, personally appeared Andrew Garrett, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

_____
 Megan S. Roberts

Printed Name

MEGAN S. ROBERTS
Notary Public - State of Florida
Commission # GG 918298
My Comm. Expires Oct 1, 2023
Bonded through National Notary Assn.

 

# BENSALEM TOWNSHIP POLICE DEPARTMENT

2400 Byberry Road • Bensalem, PA 19020 • (215) 633-3700 • Fax (215) 633-3656

**Frederick A. Harran**
**Director of Public Safety**

To Whom It May Concern:

This is a letter of verification regarding incident report number 22-01928 which was reported on 01/21/2022 as investigated by our Department.

Brief details of the incident are as follows:

INCIDENT TYPE: FRAUD
OFFICER AND BADGE NUMBER: OFFICER YASIN, BADGE# 22328
LOCATION OF INCIDENT: 3554 HULMEVILLE RD BENSALEM, PA  19020
DATE/TIME OF REPORT: 01/21/2022 AT 1300 HOURS

A brief description of this report is as follows:


On Friday, 1/21/2022 at approximately 1300 hours, I was dispatched a walk-in regarding a report of fraud.

I made contact with the complainant, Neil Anand, who stated he is the manager at Institute of Advanced Medicine and Surgery located at 3554 Hulmeville Road. Anand stated an unknown subject was able to electronically hack the medical records for the office and change patients personal information. Anand advised the company did not suffer any monitory loss and the only thing the hackers did were change personal information.

Anand stated he does have IP addresses for the suspected hackers. I provided him with an Evidence.com link to submit any further information. Case was assigned to Det. G. Jackson for investigation.

On this date, I reviewed the list of IP addresses provided by the complainant that had hacked into their network.

Approximately (30) IP addresses were provided by the complainant dating from **8/2018 - 1/2020**. Preliminary research done by this investigator showed the (30) IP addresses provided came from all across the United States to different areas with different internet providers.

The complainant was contacted and advised of this.  He was further advised it appears their information was being shared with several people with several internet providers across the Country and narrowing it to one person was unfeasible.

The complainant was unaware of any patient's information ever being fraudulently used.

*An Internationally Accredited Agency*

*~ Protect with honor, Serve with pride ~*

## *Exhibit C*



## BENSALEM TOWNSHIP POLICE DEPARTMENT

2400 Byberry Road • Bensalem, PA 19020 • (215) 633-3700 • Fax (215) 633-3656

**Frederick A. Harran**
**Director of Public Safety**



The date of the last compromise was listed as 1/4/2020.  This date is over (2) years which is beyond the statute of limitations for charging under Title 18 7611 Unlawful Use of Computer and other Computer Crimes.

The complainant thanked me and was provided my contact information.

If you have any further questions regarding this incident, please feel free to contact this Department at (215) 633-3707 to speak with a member of the Records staff.

Sincerely,

Bensalem Police Records

*An Internationally Accredited Agency*

*~ Protect with honor, Serve with pride ~*

4/9/21

I am writing this letter to state that the Dr. Chrono audit log shows that I logged in and accessed multiple charts at the various times on several dates

| | | Per audit |
|---|---|---|
| 11/23/18 | 19:35 - 20 21 PM | 50 - 70 Charts |
| 12/8/18 | 22:35 - 23:59 PM | |
| 12/9/18 | 0:10           Am | |
| 12/18/18 | 01:35 - 01:44 AM | |
| 12/30/18 | 21:32 - 23:11 PM | 50-70 charts |

I did not go home or access these numerous charts from any computer. If I ever accessed any charts from home it would of been a few charts, and would not be at the hours listed.

Commonwealth of Pennsylvania

Notarial Seal
JOANN TROUTT – Notary Public
BENSALEM TWP, BUCKS COUNTY
My Commission Expires Jun 29, 2021

4-9-2021

Sincerely
Maria Costanzo
Maria Costanzo

Exhibit D

# UNITED STATES DISTRICT COURT

for the

Eastern District of Pennsylvania

| | |
|---|---|
| In the Matter of the Search of ) | |
| *(Briefly describe the property to be searched* ) | Case No.  19-1413-M |
| *or identify the person by name and address)* ) | |
| information associated with Institute of Advanced ) | |
| Medicine & Surgery that is stored at premises controlled ) | |
| by DrChrono ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A

located in the ___Northern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 USC 1347 | Health Care Fraud |
| 18 USC 1343 | Wire Fraud |
| 21 USC 841(a)(1) and 846 | Conspiracy to Distribute Controlled Substances, among other statutes |

The application is based on these facts:
See Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Martin McDonald, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  8-20-19

_____
*Judge's signature*

City and state:  Philadelphia, PA

Timothy R. Rice, U.S. Magistrate Judge
*Printed name and title*

Exhibit E

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
INSTITUTE OF ADVANCED MEDICINE
& SURGERY THAT IS STORED AT
PREMISES CONTROLLED BY
DRCHRONO

Case No. ___19-1413-h___

**Filed Under Seal**

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Martin McDonald, being first duly sworn, hereby depose and state as follows:

## I.      INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for

information associated with certain accounts that are stored at premises owned, maintained,

controlled, or operated by DrChrono, an electronic medical records software provider

headquartered at 328 Gibraltar Drive, Sunnyvale, CA 94089 (the "Subject Premises"). The

information to be searched is described in the following paragraphs and in Attachment A.  This

affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a),

2703(b)(1)(A) and 2703(c)(1)(A) to require DrChrono to disclose to the government records and

other information in its possession pertaining to the subscriber or customer associated with the

accounts, including the contents of communications.

2.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have

been since June 2010. I am currently assigned to the Philadelphia Field Office where I

investigate health care fraud. My duties and responsibilities include conducting criminal

investigations of individuals, organizations, and businesses that have violated federal laws,

including, but not limited to, Title 18, United States Code, § 371 (Conspiracy to Defraud the

United States), 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1347 (Health Care Fraud), 18 U.S.C. § 1349 (Conspiracy to Commit Health Care Fraud and Wire Fraud), Title 21 U.S.C. § 841 (Distribution of Controlled Substances), and Title 42, U.S.C., § 1320a-7b(b) (Illegal Remunerations).

3.       I have participated in a variety of criminal health care fraud investigations, during the course of which I have interviewed witnesses, conducted physical surveillance, executed search warrants, and reviewed records, including claims data, bank records, phone records, medical records, invoices, and other business records. I am familiar with the records and documents maintained by health care providers and the laws and regulations related to the administration of the Medicare program.

4.       The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.       Based on my training and experience, the training and experience of other FBI personnel with expertise in electronic information and stored communications, and the facts as set forth in this affidavit, there is probable cause to search the information described in Attachment A for evidence of crimes and contraband or fruits of crimes, as described in Attachment B, specifically violations of Title 18, United States Code, § 371 (conspiracy to defraud the United States), Title 18, United States Code, § 1343 (wire fraud); Title 18, United States Code, § 1347 (health care fraud); Title 18, United States Code, § 1349 (conspiracy to commit health care fraud and wire fraud), and Title 21, United States Code §§ 841(a)(1) and 846 (conspiracy to distribute controlled substances), among other statutes.

## II.    JURISDICTION

6.    This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## III.    BACKGROUND

### A. The Relevant Health Insurance Programs

7.    Medicare is a federally-funded health care program that provides benefits to persons who are at least 65 years old or disabled. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS"). Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries." Medicare is divided into multiple parts: Part A covers hospital inpatient care, Part B covers physicians' services and outpatient care, Part C is Medicare Advantage Plans, and Part D covers prescription drugs.

8.    A medical provider is required to enroll with the Medicare program in order to submit claims for payment to CMS. To enroll in the Medicare program, a medical provider is required to enter into an agreement with CMS in which the provider agrees to comply with all applicable statutory, regulatory, and program requirements for reimbursement from Medicare. By signing the Medicare enrollment application, the provider certifies that the provider understands that payment of a claim is conditioned on the claim and the underlying transaction

complying with Medicare regulations,[1] Medicare program instructions, the law, and on the provider's compliance with all applicable conditions of participation in Medicare.

9.      Medicare covers prescriptions that are obtained from a state licensed physician, or other appropriately licensed health care provider, who is registered as required with the DEA. Medicare requires that any drug prescribed by a participating provider must be safe and effective and otherwise reasonable and necessary and will only reimburse for claims for prescriptions that were prescribed within the course of professional practice and for a legitimate medical purpose. Generally, the pharmacy submits the claim to Medicare for the prescription medication using the information contained in the prescription, such as prescribing physician's name, patient information, drug, strength, and quantity dispensed. Medicare relies on the accuracy of the information in a claim when making payments and presumes that the underlying prescription was written within the usual course of professional practice and for a legitimate medical purpose. Medicare does not reimburse for medically unnecessary medications.

10.      The United States Office of Personnel Management ("OPM") serves as the chief human resources agency and personnel policy manager for the federal government. Among its many duties, OPM manages the Federal Employees Health Benefits Program ("FEHBP"). FEHBP benefits are afforded to all federal employees and their family members. Federal employees may choose from over 300 FEHBP contracted health insurance carriers. Benefits are administered by private insurance companies and paid for, in large part, by OPM. A medical

---

[1] There are limited exceptions to this rule, none of which are applicable to this investigation.

provider may enroll with OPM as a participating provider in order to submit claims to OPM for medical services to federal employees and their family members.

11.      The United States Department of Labor Office of Workers' Compensation Program ("OWCP") administers the federal workers' compensation program which provides certain benefits, including health care benefits and wage loss replacement, to federal employees who sustain a work-related injury. *See* 5 U.S.C. §§ 8101, *et seq.* All providers are required to enroll with OWCP through its designated bill processing agent and may submit claims for payment under their issued provider number.

12.      Independence Blue Cross ("IBC") offers health insurance plans for individuals and families throughout southeastern Pennsylvania. IBC is the largest health insurer in the Philadelphia area and offers a wide variety of health plans, including managed care and traditional indemnity insurance. A medical provider may enroll with IBC as a participating provider in order to submit claims to IBC for medical services to federal employees and their family members.

13.      Like Medicare, OPM, OWCP, and IBC require that any drug prescribed by a participating provider must be safe and effective and otherwise reasonable and necessary and will only reimburse for claims for prescriptions for controlled substance that were prescribed within the course of professional practice and for a legitimate medical purpose by a state licensed physician, or other appropriately licensed health care provider.

### B. Relevant Statutes and Guidelines

#### *Wire Fraud*

14.      It is a crime for any person, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses,

representations, or promises, transits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice. See Title 18, United States Code, Section 1343.

### Health Care Fraud

15. It is a crime for any person to knowingly and willfully execute, or attempt to execute, a scheme or artifice to defraud any health care benefit program, or to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program. See Title 18, United State Code, Section 1347.

16. A "health care benefit program" is any public or private plan or contract, affecting commerce, under which any medical benefit, item or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract. See Title 18, United States Code, Section 24.

17. Title 18, United States Code, Section 1349, provides that any person who attempts or conspires to commit health care fraud shall be subject to the same penalties as those proscribed in 18 U.S.C. § 1347.

18. Medicare, OPM, OWCP, and IBC are each a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

### Title 21 and the Controlled Substance Act

19. The Controlled Substance Act ("CSA") governs the manufacturing, distributing, and dispensing of controlled substances in the United States. See 21 U.S.C. §§ 801-971. "A prescription for a controlled substance…must be issued for a legitimate medical purpose by an

6

individual practitioner acting in the usual course of his professional practice." See Title 21, C.F.R, § 1306.04

20.　It is a crime to knowingly and intentionally distribute a controlled substance other than in the usual course of professional practice and for a legitimate medical purpose. See Title 21, U.S.C, § 841(a)(1). It is also a crime to attempt or conspire to violate § 841(a)(1). See Title 21, U.S.C. § 846

21.　The CSA classifies drugs into five schedules based on their medicinal value, potential for abuse, and safety or dependence liability. Schedule I drugs (such as heroin and LSD) have a high potential for abuse and no currently accepted medical use. Schedule II drugs (such as methadone, oxycodone, fentanyl and morphine) may be used legitimately as painkillers, but they are highly addictive and often abused. Abuse of Schedule II controlled substances may lead to severe psychological or physical dependence. Schedule III drugs (such as codeine products with aspirin), Schedule IV drugs (such as Xanax and Clonazepam), and Schedule V drugs (such as Promethazine with codeine, a cough syrup) all have medical uses and have successively lower potential for abuse and dependence. All Scheduled drugs, except those in Schedule I, are legally available to the public with a valid prescription.

### Pennsylvania Code of Professional and Vocational Standards

22.　The Pennsylvania Code of Professional and Vocational Standards, Title 49, Chapter 16.92, defines the authority of physicians licensed in the Commonwealth of Pennsylvania to prescribe controlled substances. Chapter 16.92 provides, in pertinent part: A person licensed to practice medicine and surgery in this Commonwealth or otherwise licensed or regulated by the Board, when prescribing, administering or dispensing controlled substances, shall carry out, or cause to be carried out, the following minimum standards:

a.　*Initial medical history and physical examination.* Before commencing treatment that involves prescribing, administering or dispensing a controlled substance, an initial medical history shall be taken and an initial examination shall be conducted unless emergency circumstances justify otherwise. Alternatively, medical history and physical examination information recorded by another health care provider may be considered if the medical history was taken and the physical examination was conducted within the immediately preceding thirty days. The physical examination shall include an evaluation of the heart, lungs, blood pressure and body functions that relate to the patient's specific complaint.

b.　*Reevaluations.* Among the factors to be considered in determining the number and the frequency of follow-up evaluations that should be recommended to the patient are the condition diagnosed, the controlled substance involved, expected results and possible side effects. For chronic conditions, periodic follow-up evaluations shall be recommended to monitor the effectiveness of the controlled substance in achieving the intended results.

c.　*Patient counseling.* Appropriate counseling shall be given to the patient regarding the condition diagnosed and the controlled substance prescribed, administered or dispensed. Unless the patient is in an inpatient care setting, the patient shall be specifically counseled about dosage levels, instructions for use, frequency and duration of use and possible side effects.

d.　*Medical Records.* Certain information shall be recorded in the patient's medical record on each occasion when a controlled substance is prescribed, administered or dispensed. This information shall include the name of the controlled substance, its strength, the quantity and the date it was prescribed, administered or dispensed to a patient. The medical record shall also include a specification of the symptoms observed and reported, the diagnosis of

8

the condition for which the controlled substance is being given and the directions given to the patient for the use of the controlled substance. If the same controlled substance continues to be prescribed, administered or dispensed, the medical record shall reflect changes in the symptoms observed and reported, in the diagnosis of the condition for which the controlled substance is being given and in the directions given to the patient.

### *Centers for Disease Control and Prevention ("CDC") Guidelines*

23.     According to CDC guidelines for prescribing opioids for chronic pain that were issued in March 2016, clinicians should use caution when prescribing opioids at any dosage, and should carefully reassess evidence of individual benefits and risks when considering increasing dosages to more than/equal 50 MME per day[2]. According to the CDC, clinicians should avoid increasing dosages to more than/equal to 90 MME per day or carefully justify a decision to titrate dosage to more than/equal to 90 MME per day.

24.     In the March 2016 guidelines, the CDC defined chronic pain as pain that typically lasts greater than three months or past the time of normal tissue healing. According to the CDC, patients with chronic pain should receive treatment that provides the greatest benefits relative to the risks. Although opioids can reduce pain during short-term use, clinical evidence found insufficient evidence to determine whether pain relief is sustained and whether function or quality of life improves with long-term opioid therapy. While benefits for pain relief, function

---

[2] The CDC defines morphine milligram equivalents per day as the amount of morphine an opioid dose is equal to when prescribed, and in its "CDC Guideline for Prescribing Opioids for Chronic Pain" states the MME per day is often used as a gauge of the abuse and overdose potential of the amount of opioid that is being given at a particular time.

9

and quality of life with long-term opioid use for chronic pain are uncertain, risks associated with long-term opioid use are clearer and significant. Based on clinical evidence review, the CDC states long-term opioid use for chronic pain is associated with serious risks including increased risk for opioid use disorder, overdose, myocardial infarction, and motor vehicle injury.

## C. Relevant Individuals and Entities

25.     Neil K. Anand ("ANAND") is a medical doctor who holds himself out as a provider for pain management and addiction medicine. ANAND operates a medical practice that focuses on pain management at three locations: 5000 Frankford Avenue, Suite 2, Philadelphia, PA ("Location 1"); 5735 Ridge Avenue, Suite 101, Philadelphia, PA ("Location 2"); and 3554 Hulmeville Road, Suite 101, Bensalem, Pennsylvania ("Location 3") (collectively referred to as the "PRACTICE"). ANAND graduated from Albany Medical College in 2001, and was issued Pennsylvania medical license MD422681 on July 17, 2003. ANAND was subsequently assigned DEA Registration Number BA8444565 for the purpose of prescribing controlled substances in Schedules II through V. ANAND was also issued DEA Registration Number XA8444565 for the purpose of prescribing buprenorphine products, including Suboxone, a Schedule III controlled substance, indicated for treatment of opioid dependence.[3]

26.     ANAND owns several non-pharmacy dispensing sites which provide in-office dispensing of medications to patients at the PRACTICE, including Anand Medical Investment

---

[3] As of August 20, 2011, ANAND was authorized to administer, dispense, and prescribe buprenorphine products, including Suboxone, for the purpose of drug addiction treatment. Therefore, ANAND may qualify as a "program director" of a drug treatment center. Since the confidentiality of patient records at authorized drug treatment programs is highly regulated and subject to special restrictions and requirements as set forth in Titles 21 and 42 of the United States Code and the Code of Federal Regulations, on November 5, 2018 and June 7, 2019, the

10

("AMI"), Institute of Advanced Medicine and Surgery ("IAMS"), and Bucks County Pain and Perioperative PLLC doing business as Bucks County Spine and Pain Medicine ("BCSPM") (collectively referred to as the "DISPENSARIES"). Based on my review of Pennsylvania Department of State Records ("PADOS"), I am aware that ANAND is the owner and operator of the DISPENSARIES, the DISPENSARIES are currently active, and the DISPENSARIES are registered to 1313 Cheltenham Drive, Bensalem, Pennsylvania. Based on information learned during this investigation, I am aware that 1313 Cheltenham Drive, Bensalem, Pennsylvania is ANAND's residence.

27.    ANAND and the DISPENSARIES participated in numerous federal and private insurance health care plans, including Medicare, OPM, OWCP, and IBC.

28.    Atif Mahmood Malik ("MALIK") is a foreign trained physician who received his medical degree from Ayub Medical College in Pakistan in January 2013. MALIK is not licensed to practice medicine in the United States. According to documents obtained from the Educational Commission for Foreign Medical Graduates ("ECFMG"), MALIK completed Step 1 of the process to become licensed to practice medicine in the United States.[4] MALIK worked for ANAND from 2018 through June 2019.

29.    Asif Khan Kundi ("KUNDI") is a foreign trained physician who received his medical degree from Ayub Medical College in Pakistan in September of 2012.  KUNDI is not

---

government obtained authorizations to use an undercover agent and/or confidential source and to obtain records from the PRACTICE.

[4] According to the ECFMG's website, an international medical graduate ("IMG") begins the certification process by first confirming that his/her medical school meets ECFMG requirements. Then, an IMG applies to the ECFMG for a USMLE/ECFMG Identification Number to use for the application and examination. To be certified by ECFMG, an IMG must meet examination and medical education credential requirements. These requirements include passing performance

licensed to practice medicine in the United States. According to documents obtained from the ECFMG, KUNDI failed to show up for the first examination required for licensure in the United States. KUNDI has been working for ANAND for the past approximately two years and appears to manage the DISPENSARIES.

30. Former Employee 1 is a foreign trained physician who received his medical degree from Katurba Medical College in India in March 2015. Former Employee 1 is not licensed to practice medicine in the United States. According to documents obtained from the ECFMG, Former Employee 1 completed Steps 1 and 2 of the process to become licensed in the United States, passing Step 2 in July 2018. Between approximately July 2018 and November 2018, Former Employee 1 worked for ANAND an average of two days per week.

31. Former Employee 2 is a nurse practitioner ("NP") who graduated from the nurse practitioner program at Thomas Jefferson University in August 2017 and received board licensing in November 2017. Former Employee 2 worked for ANAND from June 2018 through January 2019.

## IV. DRCHRONO

32. DrChrono provides a web-based Electronic Health Record ("EHR") system to physicians. According to DrChrono's website, at www.drchrono.com, "DrChrono EHR is built on a seamlessly integrated platform" to fit a particular practice's needs. According to this website, "physicians using DrChrono have seen tremendous amount of efficiency and time

---

on medical science and clinical skills examinations—United States Medical Licensing Examination ("USMLE") Step 1, Step 2 Clinical Knowledge, and Step 2 Clinical Skills are the exams currently administered that satisfy these requirements—and primary-source verification of the IMG's medical education credentials, including the final medical diploma, final medical school transcript, and transcript(s) to document transferred academic credits (if applicable).

12

savings through custom forms, pre-made specialty templates, and charting shortcuts that help reduce charting time so they can focus on patient care" and the EHR comes with "patient portal, check-in app, online schedule tools,...automated features to engage your patients quickly and effectively and reduce no shows,...integrated lab ordering, eFax, e-referrals task system, and inter-practice chats."

33. Pursuant to a subpoena issued in July 2019, DrChrono disclosed that it maintained an account associated with ANAND under the customer name of Institute of Advanced Medicine & Surgery, for which there were numerous users.[5] The users associated with this account are as follows:

| NAME | EHR USERNAME |
|---|---|
| Neil Anand | Cardiacgasman |
| Robert Buckley | Docbuc77 |
| Bernard | BStuetz |
| Viktoriya Makarova | Vicktoriya |
| Deborah McGregor | AppleHeart |
| Paul Soccio | Drsoccio |
| Jed Shapiro | Jedshapiro |
| Charles Williams | Cdwilliams2OLD |
| Robert OLD | Docbucc77old |
| Shaheen Magsi | Smagsi |
| Bill Leen | Williamleen |
| Batoul k | Batoulk |
| Atif Malik | Atmalik |
| Sameep Bhardwaj | Billingindia3 |
| Francesca Martinez | Edandfrances |
| Elis Ananieva | Eananieva |
| Shunwei Wang | Davidshunwei |
| Shefali Shah | Shefali |
| Chelsea Torres | Cetorres |

---

[5] DrChrono produced records responsive to the July 2019 subpoena indicating the account holder and users for the account associated with ANAND. Under 18 USC 2703(a), the government seeks the instant search warrant in order to obtain the records and content of ANAND's account. *because* DrChrono requested a search warrant to obtain content. *MM 8/20/19*

| NAME | EHR USERNAME |
|---|---|
| Maria Costanzo | Mcostanzo |
| Mihir Parekh | Billingindia2 |
| Patricia Shapiro | Patti2525 |
| Ashley Burgos | Ashleybu |
| Courtney Dovidio | Cdovidio |
| Theresa Jacob | Tjacob |
| Nina Anand | Ninaanand |
| Jimik Patel | Jimikpatel |
| Maryann Kundi | Mkundi |
| Susan Soccio | Susansoccio |
| Sujal Kanudawala | Billingindia1 |
| Asif Kundi | Akundi |
| JedScott Shapiro | Jedscott |
| Patrice Caiola | Pat1234 |
| Robert Buckley | Docbuc7 |
| Joan Garry | JGarry1203 |
| Lola David | Loladavid |
| Batuol Kheiri | Batuol |
| Joan Garry | JGarry |
| Susan Soccio | Smsoccio |
| Susan Soccio | Susansoccio1 |
| Batuol Kheiri | batuolk |

34.     According to DrChrono's subpoena response on July 22, 2019, the date of the last login to the account was July 22, 2019.

35.     In my experience investigating health care fraud, I have learned that EHR document both services purportedly provided and the purported conditions of patients who received services. Such information can be important evidence when attempting to determine whether claims submitted to Medicare, OPM, OWCP, and IBC for services purportedly provided by a physician were actually provided and medically necessary, and whether the physician billing Medicare, OPM, OWCP, and IBC actually rendered these services. Administrative logs within the electronic medical record system also indicate whether records were altered to hide fraudulent activities.

14

36.     In general, providers like DrChrono ask each of their subscribers to provide certain personal identifying information when registering for an account. This information can include the subscriber's full name, physical address, telephone numbers and other identifiers, e-mail addresses, and, for paying subscribers, a means and source of payment (including any credit or bank account number). Providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account, and other log files that reflect usage of the account. In addition, providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP address associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the account.

37.     In some cases, account users will communicate directly with a provider about issues relating to their account, such as technical problems, billing inquiries, or complaints from other users. Providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

## V.     **PROBABLE CAUSE**

38.     Based upon my review of: (1) interviews of former employees and patients; (2) recordings made by Patient 7; (3) claims data; and (4) Pennsylvania Prescription Drug

Monitoring Program ("PDMP") data,[6] there is probable cause to believe that ANAND, together with others, submitted or caused the submission of false and fraudulent claims to Medicare, OPM, OWCP, and IBC for the provision of medically unnecessary prescription medications. Further, there is probable cause to believe that ANAND, together with others, knowingly and intentionally distributed a controlled substance outside the usual course of professional practice and not for a legitimate medical purpose.

39.    As a medical doctor, ANAND was authorized to prescribe medications to patients, including controlled substances, for legitimate medical purposes and in the usual course of professional practice. As the owner of non-pharmacy dispensing sites, ANAND could dispense prescription drugs from the PRACTICE and submit claims to insurance programs for those prescription drugs. The investigation revealed that ANAND operated a scheme in which ANAND prescribed medically unnecessary prescription medications to patients at the PRACTICE that were dispensed and billed by the DISPENSARIES to Medicare, OPM, and IBC.[7] As a matter of course, patients automatically received a bag of medications at each visit to the PRACTICE which contained numerous medically unnecessary prescription medications,

_____

[6] The Pennsylvania Prescription Drug Monitoring Program ("PDMP") is a statewide computer program which collects information regarding prescriptions of controlled substances submitted by pharmacies and dispensing practitioners. These programs assist in the detection of patients and clinicians who are diverting controlled substances.

[7] The Dispensaries did not submit claims to OWCP because the Dispensaries were not enrolled with OWCP.

16

including Lidocaine[8], Vanatol LQ/S[9], Temazepam[10], Allzital[11], Metaxalone[12], Diclofenac

Sodium Gel[13], Celecoxib[14], Nalfon[15], and Omeprazole[16], among others. The bags of medications

were referred to as "Goody Bags" by patients and staff at the PRACTICE. To carry out his

scheme, ANAND not only dispensed unnecessary medications to patients under his care, but

surreptitiously recruited them as unknowing participants in his scheme because they had to

accept the Goody Bag in order to receive a prescription for a controlled substance and falsely

---

[8] Lidocaine is an anesthetic and antiarrhythmic that can treat irregular heartbeats (arrhythmias). It can also relieve pain and numb the skin.

[9] Vanatol is an analgesic that can treat headaches. Vanatol can cause paranoid or suicidal ideation and impair memory, judgment, and coordination. Combining with other substances, particularly alcohol, can slow breathing and possibly lead to death.

[10] Temazepam, a Schedule IV controlled substance, is a sedative that can treat insomnia. It can cause paranoid or suicidal ideation and impair memory, judgment, and coordination. Combining with other substances, particularly alcohol, can slow breathing and possibly lead to death.

[11] Allzital is a sedative and analgesic that can treat tension headaches. It can cause paranoid or suicidal ideation and impair memory, judgment, and coordination. Combining with other substances, particularly alcohol, can slow breathing and possibly lead to death.

[12] Metaxalone is a muscle relaxant that can relax certain muscles. It can also relieve pain caused by injuries, sprains, and strains.

[13] Diclofenac Sodium Gel is a nonsteroidal anti-inflammatory drug that can treat pain, migraines, and arthritis in its oral form. It can also treat actinic keratoses in its topical form.

[14] Celecoxib is a nonsteroidal anti-inflammatory drug that is used to treat pain and inflammation associated with arthritis and ankylosing spondylitis, and acute pain.

[15] Nalfon is a nonsteroidal anti-inflammatory drug used to treat mild to moderate pain, and helps to relieve symptoms of arthritis(osteoarthritis and rheumatoid arthritis), such as inflammation, swelling, stiffness, and joint pain.

[16] Omeprazole is a proton-pump inhibitor that can treat heartburn, a damaged esophagus, stomach ulcers, and gastroesophageal reflux disease.

sign a tablet acknowledging payment of a co-pay for the Goody Bag. The investigation revealed that patients did not want or need the goody bags, that patients were not told what medications were in the goody bag or how the medications should be used, and that patients were told to toss or give away unused Goody Bags.

40. In order to facilitate his scheme and maximize the number patients seen at the PRACTICE, ANAND employed foreign medical school graduates who were not licensed to practice medicine in the United States, including MALIK, KUNDI and Former Employee 1, among others (collectively referred to as "Foreign Graduates"). The Foreign Graduates presented themselves as doctors to unsuspecting patients and were the primary providers of medical services purportedly provided at the PRACTICE. The investigation revealed that patients believed that the Foreign Graduates were licensed physicians because they introduced themselves as doctors and patients and staff referred to them as doctors. Generally, patients were seen by the Foreign Graduates who provided medical advice to patients and prescribed controlled substances to patients. The Foreign Graduates filled in the details of the prescription, including drug information and dosage, on prescriptions that were either pre-signed by ANAND or a license professional, such as Former Employee 2 or ANAND, would briefly enter the examination room to sign a number of blank prescriptions. Further, when a patient with certain insurance coverage, including Medicare and IBC, arrived at the PRACTICE, KUNDI identified what medications the patient's insurance would cover and prepared a bag of medications for the patient, the Goody Bag. The medications in the Goody Bag are pre-determined based on insurance coverage, not the medical needs of a particular patient.

41. I and other law enforcement officers have interviewed former employees and patients seen at the PRACTICE.

18

### *Former Employee 1*

42.     On or about July 16, 2019 and July 30, 2019, law enforcement interviewed Former Employee 1 who worked for ANAND from July 2018 to November 2018. ANAND described the duties of Former Employee 1 as medical intern or junior scribe, defined by ANAND as someone who is learning the language of prescriptions and would write prescriptions under ANAND's guidance with ANAND signing off on the prescriptions. Former Employee 1 worked between two to four days a week primarily at Location 1 and Location 2. ANAND employed four other foreign medical school graduates in addition to Former Employee 1, including MALIK and KUNDI.

43.     Former Employee 1 stated that patients were seen by the Foreign Graduates and that ANAND or FORMER EMPLOYEE 2 merely signed prescriptions prepared by the Foreign Graduates or ANAND left blank prescriptions for the Foreign Graduates. Former Employee 1 stated that there was a system in place at the PRACTICE that patients had to take the Goody Bags at every visit and receive injections at every second or third visit, otherwise patients may not receive prescriptions for controlled substances. KUNDI was responsible for preparing the Goody Bags and the Goody Bags contained whatever medications were covered by a particular patient's insurance. KUNDI brought the Goody Bag to the exam room and had patients sign a tablet upon receipt of the Goody Bag.

### *Former Employee 2*

44.     On or about July 8, 2019 and July 16, 2019, law enforcement interviewed Former Employee 2 who worked for ANAND as a NP from June 2018 to January 2019. ANAND described the duties of Former Employee 2 as visiting with patients, prescribing medications, and assisting with injections. Former Employee 2 generally worked Mondays and Tuesdays at

19

Location 1 or Location 2. Former Employee 2 did not see ANAND often on those days. Former Employee 2 was trained on how to use document patient visits in DrChrono.

45. Former Employee 2 stated that KUNDI handled the DISPENSARIES and that each patient received a bag of pre-set medications. Former Employee 2 stated that every time a patient came to the office, KUNDI looked up what medications the patient was receiving from the DISPENSARIES and brought a Goody Bag to the exam room, at which time the patient signed a tablet. Former Employee 2 heard patients state that they did not need the medications and were told by KUNDI or MALIK to take the medication and use it later or give it to someone else. Former Employee 2 heard ANAND tell patients that they would not get their Oxycodone prescription if they did not receive an injection. Former Employee 2 believes that same principle applied with the Goody Bags filled at the DISPENSARIES.

46. Former Employee 2 stated that the Foreign Graduates saw the patients and told Former Employee 2 what prescriptions a patient needed at which time Former Employee 2 signed the requested number of blank prescriptions and handed it to the Foreign Graduates who filled in drug and patient information. On average, each patient received between two and three prescriptions.

47. Former Employee 2 stated that ANAND, office staff and patients referred to Foreign Graduates as physicians. ANAND' left pre-signed prescription pads in a cabinet for the Foreign Graduates to use.

### *Patient 1*

48. On or about June 3, 2019, law enforcement agents interviewed Patient 1, whose identity is known to me. Patient 1 began seeing ANAND in approximately January 2015 for knee and lower back pain. Initially, Patient 1 paid approximately $400 cash for treatment

20

because ANAND did not accept Patient's 1 health insurance. In 2016, Patient 1 enrolled in Medicare and Medicaid, at which time ANAND began giving Patient 1 injections and a bag of medications that Patient 1 did not need or want.

49. Based on my review of Medicare claims data, I am aware that on 35 dates between February 26, 2016 and April 4, 2019, ANAND prescribed approximately 128 Goody Bag medications to Patient 1 for which he was paid approximately $66,770. Below are a sample of dates on which ANAND prescribed Goody Bags for Patient 1.

| Approximate Date Prescription Written | Medication Prescribed | Billing Provider | Paid Amount |
|---|---|---|---|
| November 1, 2017 | Vanatol S | AMI | $3,207.93 |
| November 1, 2017 | Diclofenac Sodium | AMI | $201.17 |
| November 1, 2017 | Temazepam | AMI | $125.58 |
| November 1, 2017 | Lidocaine | AMI | $32.82 |
| November 1, 2017 | Cyclobenzaprine Hydrochlo | AMI | $343.38 |
| November 1, 2017 | Fenoprofen Calcium | AMI | $281.85 |
| November 29, 2017 | Naproxen Sodium CR | AMI | $1,036.59 |
| November 29, 2017 | Diclofenac Sodium | AMI | $195.50 |
| November 29, 2017 | Temazepam | AMI | $110.35 |
| November 29, 2017 | Lidocaine | AMI | $167.35 |
| November 29, 2017 | Cyclobenzaprine Hydrochlo | AMI | $345.32 |
| November 29, 2017 | Nalfon | AMI | $406.94 |
| January 17, 2018 | Naproxen Sodium CR | AMI | $813.81 |
| January 17, 2018 | Diclofenac Sodium | AMI | $279.46 |
| January 17, 2018 | Vanatol LQ | AMI | $3,508.00 |
| January 17, 2018 | Temazepam | AMI | $143.96 |
| January 17, 2018 | Omeprazole/Sodium Bicarbo | AMI | $2,359.81 |
| January 17, 2018 | Cyclobenzaprine Hydrochlo | AMI | $411.74 |
| June 5, 2018 | Omeprazole/Sodium Bicarbo | AMI | $1,106.12 |
| June 5, 2018 | Allzital | AMI | $1,197.94 |
| June 5, 2018 | Naproxen Sodium CR | AMI | $1,614.50 |
| June 5, 2018 | Diclofenac Sodium | AMI | $270.50 |
| June 5, 2018 | Diclofenac Sodium | AMI | $386.83 |
| June 5, 2018 | Vanatol LQ | AMI | $1,162.50 |
| June 5, 2018 | Temazepam | AMI | $157.71 |
| June 5, 2018 | Lidocaine | AMI | $1,013.38 |

| Approximate Date Prescription Written | Medication Prescribed | Billing Provider | Paid Amount |
|---|---|---|---|
| June 5, 2018 | Cyclobenzaprine Hydrochlo | AMI | $462.08 |
| June 5, 2018 | Nalfon | AMI | $408.99 |

50. Based on my review of PDMP data, I am aware that on 31 dates between January 28, 2016 and June 20, 2019, Patient 1 received approximately 31 prescriptions for controlled substances from ANAND. Below are a sample of dates on which ANAND prescribed controlled substances to Patient 1.

| Approximate Date Prescription Written | Prescribed Schedule II Controlled Substance | Quantity | Days of Supply | MME/Per Day |
|---|---|---|---|---|
| September 6, 2017 | Fentanyl 100 mcg/hr patch | 10 | 30 | 240.0 MME |
| September 6, 2017 | Methadone hcl 10 mg tablet | 360 | 30 | 360.0 MME |
| November 29, 2017 | Methadone hcl 10 mg tablet | 360 | 30 | 360.0 MME |
| November 29, 2017 | Fentanyl 100 mcg/hr patch | 10 | 30 | 240.0 MME |
| January 24, 2018 | Methadone hcl 10 mg tablet | 360 | 30 | 360.0 MME |
| January 24, 2018 | Fentanyl 100 mcg/hr patch | 10 | 30 | 240.0 MME |

### Patient 2

51. On or about May 9, 2019, law enforcement agents interviewed Patient 2, whose identity is known to me. Patient 2 stated that Patient 2 had IBC insurance and was a patient of ANAND's for two years for back and shoulder pain. Patient 2 first visited Location 1 and Patient 2 received prescriptions for Percocet from ANAND which Patient 2 filled at a local pharmacy. At every appointment, Patient 2 received a bag of medications, including Lidocaine

cream, among other medications. Upon receipt of the bag of medications, Patient 2 was instructed to sign a tablet indicating that Patient 2 paid a co-pay for the medications though Patient 2 never paid a copay. Patient 2 was never asked if she wanted or needed the bag of medications.

52. Based on my review of IBC claims data, I am aware that on 7 dates between June 13, 2018 and December 4, 2018, ANAND prescribed approximately 61 Goody Bag medications to Patient 2 for which he was paid approximately $47,711. Below are a sample of dates on which ANAND prescribed Goody Bags for Patient 2.

| Approximate Date Prescription Written | Medication Prescribed | Billing Provider | Paid Amount |
|---|---|---|---|
| June 13, 2018 | Cyclobenzaprine HCL | AMI | $453.02 |
| June 13, 2018 | Diclofenac Sodium | AMI | $814.35 |
| June 13, 2018 | Lidocaine | AMI | $98.27 |
| June 13, 2018 | Lidocaine | AMI | $562.56 |
| June 13, 2018 | Mebolic | AMI | $821.19 |
| June 13, 2018 | Nalfon | AMI | $298.58 |
| June 13, 2018 | Naproxen Sodium CR | AMI | $1,507.65 |
| June 13, 2018 | Omeprazole/Sodium Bicarbo | AMI | $468.10 |
| June 13, 2018 | Temazepam | AMI | $132.98 |
| June 13, 2018 | Vanatol LQ | AMI | $1,051.25 |
| September 11, 2018 | Cyclobenzaprine HCL | AMI | $409.01 |
| September 11, 2018 | Diclofenac Sodium | AMI | $778.65 |
| September 11, 2018 | Eszopiclone | AMI | $136.73 |
| September 11, 2018 | Lidocaine | AMI | $576.52 |
| September 11, 2018 | Nalfon | AMI | $298.58 |
| September 11, 2018 | Naproxen Sodium CR | AMI | $1,541.90 |
| September 11, 2018 | Omeprazole/Sodium Bicarbo | AMI | $486.06 |
| September 11, 2018 | Tramadol HCL ER | AMI | $209.83 |
| September 11, 2018 | Vanatol LQ | AMI | $1,166.75 |
| September 11, 2018 | Xyzbac | AMI | $1,822.28 |

53. Based on my review of PDMP data, I am aware that I am aware that on 13 dates between June 13, 2018 and June 11, 2019, Patient 2 received approximately 13 prescriptions for

controlled substances from ANAND or Former Employee. Below are a sample of dates on which ANAND or Former Employee prescribed controlled substances to Patient 2.

| Approximate Date Prescription Written | Prescribed Schedule II Controlled Substance | Quantity | Days of Supply | MME/Per Day |
|---|---|---|---|---|
| June 13, 2018 | Oxycodone HCL 10 mg tablet | 120 | 20 | 90.0 MME |
| September 11, 2018 | Oxycodone HCL 10 mg tablet | 120 | 30 | 60.0 MME |

### *Patient 3*

54. On or about May 8, 2019, law enforcement agents interviewed Patient 3, whose identity is known to me. Patient 3 stated that Patient 3 had IBC insurance and became a patient of ANAND's in or about May 2017 for lower back pain. Patient 3 initially sought treatment at Location 1. Beginning with the first office visit and at each subsequent appointment, Patient 3 was given a bag of medications, consisting of creams and pills such as Lidocaine and Temazepam, among other medications, but no one ever told Patient 3 what medications were in the bag or how the medications should be used. Upon receiving the bag of medications, Patient 3 was instructed to sign a tablet indicating that Patient 3 paid a copay for the bag of medications, though Patient 3 did not actually pay a copay. Patient 3 sometimes used the Lidocaine, but the other medications just accumulated and got thrown away. Patient 3 stated patients and office staff referred to the bag of medications dispensed by ANAND as Goody Bags.

55. Based on my review of IBC claims data, I am aware that on 17 dates between January 20, 2016 and February 13, 2019, ANAND prescribed approximately 59 Goody Bag medications to Patient 3 for which he was paid approximately $22,955. Below are a sample of dates on which ANAND prescribed Goody Bags for Patient 3.

24

| Approximate Date Prescription Written | Medication Prescribed | Billing Provider | Paid Amount |
|---|---|---|---|
| April 13, 2016 | Duloxetine HCL | BCSPM | $350.33 |
| April 13, 2016 | Cyclobenzaprine HCL | BCSPM | $480.83 |
| April 13, 2016 | Diclofenac Sodium | BCSPM | $388.05 |
| April 13, 2016 | Lidocaine | BCSPM | $120.04 |
| May 9, 2018 | Indomethacin ER | AMI | $70.45 |
| May 9, 2018 | Eszopiclone | AMI | $503.56 |
| May 9, 2018 | Vanatol LQ | AMI | $1,047.50 |
| May 9, 2018 | Lidocaine | AMI | $558.81 |
| May 9, 2018 | Cyclobenzaprine HCL | AMI | $449.27 |
| June 13, 2018 | Indomethacin ER | AMI | $70.45 |
| June 13, 2018 | Eszopiclone | AMI | $503.56 |
| June 13, 2018 | Vanatol LQ | AMI | $1,047.50 |
| June 13, 2018 | Cyclobenzaprine HCL | AMI | $449.27 |

56. Based on my review of IBC claims data, I am aware that on 22 dates between January 20, 2016 and August 16, 2018, Patient 3 received approximately 22 prescriptions for Schedule III controlled substances from ANAND. Below are a sample of dates on which ANAND prescribed controlled substances to Patient 3.

| Approximate Date Prescription Written | Prescribed Schedule III Controlled Substance | Quantity | Days of Supply |
|---|---|---|---|
| April 18, 2016 | Suboxone | 60 | 30 |
| May 9, 2018 | Suboxone | 60 | 60 |
| June 14, 2018 | Suboxone | 30 | 30 |

### *Patient 4*

57. On or about May 22, 2019, law enforcement agents interviewed Patient 4, whose identity is known to me. Patient 4 stated that Patient 4 is enrolled in Medicare and had been a patient of ANAND's for approximately three years for back pain. Patient 4 stated that Patient 4 received prescriptions for Oxycodone and Tramadol from ANAND that Patient 4 filled at a local

pharmacy and that Patient 4 was given a bag of medications at every appointment that contained Lidocaine Cream, Diclofenac Sodium Gel, and Temazepam, among other medications. Patient 4 signed a tablet indicating that Patient 4 paid a copay for the bag of medications, though Patient 4 was only asked to pay a copay about four or five times. At no time did ANAND, or any staff member, explain to Patient 4 what the medications were, how to use the medications, and why the medications were needed. Patient 4 thought the bag of medications was shady and that ANAND prescribed the bag of medications to make money. Patient 4 could not refuse to accept the bag of medications because then Patient 4 would not get the prescriptions for the medications Patient 4 really needed. Patient 4 discarded most of the medications dispensed by ANAND.

58.     Patient 4 stated that Patient 4 left ANAND's practice and obtained Patient 4's medical records upon leaving ANAND's practice.[17]  Based on my review of Patient 4's medical records, I am aware that the medical records contained entries from DrChrono with notes for office visits on September 9, 2018 and July 23, 2018 indicating that Former Employee 2 was Patient 4's medical provider on these dates. Patient 4 stated that Patient 4 had never been treated by Former Employee 2.

59.     Based on my review of Medicare claims data, I am aware that on 34 dates between April 27, 2016 and February 5, 2019, ANAND prescribed approximately 95 Goody Bag medications to Patient 4 for which he was paid approximately $41,515.  Below are a sample of dates on which ANAND prescribed Goody Bags for Patient 4.

_____

[17] Based on my review of Patient 4's Medicare prescription drug claims, Patient 4 left ANAND's practice in approximately March 2019.

| Approximate Date Prescription Written | Medication Prescribed | Billing Provider | Paid Amount |
|---|---|---|---|
| November 1, 2017 | Diclofenac Sodium | AMI | $287.27 |
| November 1, 2017 | Temazepam | AMI | $160.08 |
| November 1, 2017 | Lidocaine | AMI | $107.64 |
| November 1, 2017 | Omeprazole-Sodium | AMI | $1,877.65 |
| November 1, 2017 | Cyclobenzaprine HCL | AMI | $394.52 |
| November 29, 2017 | Naproxen Sodium CR | AMI | $1,184.10 |
| November 29, 2017 | Diclofenac Sodium | AMI | $287.27 |
| November 29, 2017 | Temazepam | AMI | $165.20 |
| November 29, 2017 | Fluocinonide | AMI | $1,091.91 |
| November 29, 2017 | Lidocaine | AMI | $115.13 |
| November 29, 2017 | Omeprazole-Sodium | AMI | $1,877.65 |

60.　Based on my review of PDMP data, I am aware that on 33 dates between March 31, 2016 and February 5, 2019, Patient 4 received approximately 65 prescriptions for controlled substances from ANAND or Former Employee 2. Below are a sample of dates on which ANAND or Former Employee 2 prescribed controlled substances to Patient 4.

| Approximate Date Prescription Written | Prescribed Schedule II Controlled Substance | Quantity | Days of Supply | MME/Per Day |
|---|---|---|---|---|
| November 1, 2017 | Oxycodone hcl 30 mg tablet | 120 | 20 | 270.0 MME |
| November 1, 2017 | Morphine sulf er 200 mg tablet | 60 | 30 | 400.0 MME |
| December 19, 2017 | Morphine sulf er 200 mg tablet | 60 | 30 | 400.0 MME |
| December 19, 2017 | Oxycodone hcl 30 mg tablet | 120 | 20 | 270.0 MME |

### Patient 5

61.　On or about June 3, 2019, law enforcement agents interviewed Patient 5, whose identity is known to me. Patient 5 stated that Patient 5 was enrolled into Medicare and had been

a patient of ANAND's for approximately three years for neck, back, and shoulder pain. Patient 5

stopped seeking medical care from the PRACTICE in April 2019. ANAND prescribed

Oxycodone and other medications to Patient 5 that Patient 5 filled at a local pharmacy. In 2016,

Patient 5 started receiving bags of medications from ANAND's DISPENSARIES, which

included Lidocaine, Vanatol, and Temazepam, among other medications. KUNDI usually gave

Patient 5 the bag of medication and instructed Patient 5 to sign a tablet indicating that Patient 5

paid a copay for the bag of medications, though Patient 5 did not actually pay a copay. At no

time did ANAND, or any staff member, explain to Patient 5 what the medications were, how to

use the medications, or why the medications were needed.

62.     Patient 5 further stated that on at least two occasions Patient 5 informed ANAND

that Patient 5 did not want the bag of medications and ANAND told Patient 5 that if Patient 5 did

not accept the dispensed medications, Patient 5 would not receive a prescription for Oxycodone.

Patient 5 usually discarded the bag of medications.  Patient 5 provided law enforcement with two

unopened bottles of Metaxalon (800mg/100 tablets), one unopened bottle of Temazepam

(22.5mg/30tablets), one unopened bottle of Celecoxib (200mg/60 tablets), two unopened bottles

of Nalfon (400mg), six unopened tubes of Diclofenac Sodium, and nine unopened tubes of

Lidocaine Cream. All the medications were labeled Institute of Advanced Medicine and Surgery,

Dr. Neil Anand, MD, 5735 Ridge Avenue, Philadelphia, PA 19128.

63.     ANAND told Patient 5 to use different insurance providers every month for his

prescriptions, which included Express Scripts and Envision. ANAND instructed Patient 5 to

write a letter, falsely indicating that Patient 5 wanted, needed, and utilized the medications

dispensed by ANAND's office that ANAND would submit to Patient 5's insurance provider.

ANAND informed Patient 5 that if Patient 5 did not provide this letter, Patient 5 would not

28

receive prescriptions for Oxycodone.

64.     Based on my review of Medicare claims data, I am aware that on 36 dates
between November 23, 2015 and April 1, 2019, ANAND prescribed approximately 139 Goody
Bag medications to Patient 5 for which he was paid approximately $69,938. Below are a sample
of dates on which ANAND prescribed Goody Bags for Patient 5.

| Approximate Date Prescription Written | Medication Prescribed | Billing Provider | Paid Amount |
|---|---|---|---|
| July 28, 2017 | Lidocaine | IAMS | $200.25 |
| July 28, 2017 | Allzital | IAMS | $1,205.66 |
| July 28, 2017 | Naproxen Sodium CR | IAMS | $1,036.59 |
| July 28, 2017 | Diclofenac Sodium | IAMS | $340.17 |
| July 28, 2017 | Vanatol LQ | IAMS | $1,170.00 |
| July 28, 2017 | Temazepam | IAMS | $106.09 |
| July 28, 2017 | Omeprazole/Sodium | IAMS | $467.49 |
| July 28, 2017 | Cyclobenzaprine | IAMS | $344.52 |
| July 28, 2017 | Nalfon | IAMS | $406.94 |
| October 20, 2017 | Vanatol S | IAMS | $3,207.93 |
| October 20, 2017 | Lidocaine | IAMS | $191.93 |
| October 20, 2017 | Omeprazole/Sodium | IAMS | $360.38 |
| October 20, 2017 | Cyclobenzaprine | IAMS | $343.01 |
| October 20, 2017 | Fenoprofen Calcium | IAMS | $288.48 |
| November 13, 2017 | Vanatol S | IAMS | $3,207.93 |
| November 13, 2017 | Lidocaine | IAMS | $173.58 |
| November 13, 2017 | Omeprazole/Sodium | IAMS | $358.18 |
| November 13, 2017 | Cyclobenzaprine | IAMS | $345.44 |
| November 13, 2017 | Nalfon | IAMS | $406.94 |

65.     Based on my review of PDMP data, I am aware that I am aware that on 43 dates
between November 23, 2015 and April 29, 2019, Patient 5 received approximately 83
prescriptions for controlled substances from ANAND or Former Employee 2. Below are a
sample of dates on which ANAND or Former Employee 2 prescribed controlled substances to
Patient 5.

| Approximate Date Prescription Written | Prescribed Schedule II Controlled Substance | Quantity | Days of Supply | MME/Per Day |
|---|---|---|---|---|
| July 28, 2017 | Fentanyl 100 mcg/hr patch | 10 | 30 | 240.0 MME |
| July 28, 2017 | Oxycodone hcl 30 mg tablet | 120 | 30 | 180.0 MME |
| October 20, 2017 | Fentanyl 100 mcg/hr patch | 10 | 30 | 240.0 MME |
| October 20, 2017 | Oxycodone hcl 30 mg tablet | 120 | 20 | 270.0 MME |
| November 13, 2017 | Fentanyl 100 mcg/hr patch | 10 | 30 | 240.0 MME |
| November 13, 2017 | Oxycodone hcl 30 mg tablet | 120 | 20 | 270.0 MME |

### *Patient 6*

66. On or about June 6, 2019, law enforcement agents interviewed Patient 6. Patient 6 has been seeing ANAND for pain management for approximately six or seven years. Patient 6 sees ANAND for a work-related injury sustained in 2004 while employed at the School District of Philadelphia. Patient 6 stated that all services provided by ANAND and medications prescribed by ANAND should have been billed to the School District of Philadelphia worker's compensation program. Patient 6 enrolled in Medicare in about 2003.

67. According to Patient 6, Patient 6 receives paper prescriptions from ANAND for Percocet 30mg and OxyContin 40mg and that ANAND also prescribes Lidocaine cream, a sleep medication, and muscle relaxers which are dispensed out of ANAND's in-house pharmacy. Patient 6 told ANAND that all services provided by ANAND and medications prescribed by ANAND should be billed to the School District of Philadelphia worker's compensation program. Patient 6 stated the medications from ANAND's in-house pharmacy were automatically dispensed.

68.     Based on my review of Medicare claims data, I am aware that on 27 dates between September 26, 2016 and May 21, 2019, ANAND prescribed approximately 80 Goody Bag medications to Patient 6 for which he was paid approximately $39,495. Below are a sample of dates on which ANAND prescribed Goody Bags for Patient 6.

| Approximate Date Prescription Written | Medication Prescribed | Billing Provider | Paid Amount |
|---|---|---|---|
| October 24, 2016 | Diclofenac Sodium | IAMS | $822.47 |
| October 24, 2016 | Temazepam | IAMS | $536.12 |
| October 24, 2016 | Lidocaine | IAMS | $2,353.62 |
| October 24, 2016 | Cyclobenzaprine | IAMS | $857.52 |
| July 18, 2017 | Calcipotriene | AMI | $332.05 |
| July 18, 2017 | Naproxen Sodium CR | AMI | $1,184.10 |
| July 18, 2017 | Temazepam | AMI | $160.08 |
| July 18, 2017 | Omeprazole/Sodium | AMI | $1,877.65 |
| August 1, 2017 | Fluocinonide | AMI | $908.92 |
| August 1, 2017 | Cyclobenzaprine | AMI | $320.63 |
| August 15, 2017 | Calcipotriene | AMI | $332.05 |
| August 15, 2017 | Naproxen Sodium CR | AMI | $1,184.10 |
| August 15, 2017 | Omeprazole/Sodium | AMI | $1,877.65 |

69.     Based on my review of PDMP data, I am aware that I am aware that on 42 dates between December 24, 2015 and July 17, 2019, Patient 6 received approximately 84 prescriptions for controlled substances from ANAND or Former Employee 2. Below are a sample of dates on which ANAND or Former Employee 2 prescribed controlled substances to Patient 6.

| Approximate Date Prescription Written | Prescribed Schedule II Controlled Substance | Quantity | Days of Supply | MME/Per Day |
|---|---|---|---|---|
| July 18, 2017 | Oxycodone HCL ER 40 mg tablet | 60 | 30 | 120.0 MME |

| July 18, 2017 | Oxycodone HCL 20 mg tablet | 120 | 20 | 180.0 MME |
| August 15, 2017 | Oxycodone HCL 20 mg tablet | 120 | 20 | 180.0 MME |
| August 15, 2017 | Oxycodone HCL ER 40 mg tablet | 60 | 30 | 120.0 MME |

### *Patient 7*

70.    On or about October 25, 2018, law enforcement agents interviewed Patient 7, whose identity is known to me. Patient 7 stated that Patient 7 had been a patient of ANAND's for over three years and was treated at Location 1 and Location 2 for lower back pain resulting from a motor vehicle accident. ANAND prescribes several medications for Patient 7, including oxycodone. In about August 2018, Patient 7 enrolled in IBC at which time ANAND began giving Patient 7 a bag of medications at each office visit, that included Lidocaine Cream, Vanatol, Temazepam, Allzital, Metaxalone, and Diclofenac Sodium Gel. KUNDI was usually the person who handed Patient 7 the bag of medications. At one visit, Patient 7 tried to reject the bag of medications and was told by office staff that Patient 7 should just take the bag because the insurance company covered the cost of medications. At no time did ANAND, or any staff member, explain to Patient 7 what the medications were, how to use the medications, and why the medications were needed. Patient 7 never paid a copay for the medications. Patient 7 gave agents unused medications, including three unopened bottles of Allzital (25mg/100 tablets), two unopened bottle of Metaxalone (800mg/100 tablets), and one unopened tube of Diclofenac Sodium Gel. All the medications were labeled AMI Pharmacy, Neil Anand MD, 5000 Frankford Avenue, Philadelphia, PA 19124.

71.    On or about November 6, 2018, at the direction of law enforcement, Patient 7 recorded Patient 7's appointment at LOCATION 1. Based upon my review of the recording, I am

32

aware that Patient 7 was seen by Former Employee 1 and that during the office visit, KUNDI and

Former Employee 2 entered the exam room. KUNDI handed Patient 7 a plastic bag and referred

to it as a Goody Bag. Patient 7 stated that Patient 7 was overstocked on the medications and

KUNDI replied that Patient 7 should take the Goody Bag because the insurance was already run

and ANAND would be mad if Patient 7 did not take the bag. Former Employee 1 told Patient 7

to donate the medications that Patient 7 does not need. KUNDI instructed Patient 7 to sign a

tablet. Former Employee 1 told Former Employee 2 that he needed two prescriptions, Former

Employee 2 gave Former Employee 1 two pre-signed blank prescriptions and Former Employee

1 filled out for Oxycodone and provided the prescriptions to Patient 7. Patient 7 gave the goody

bag to law enforcement. Based upon my review of the contents of the goody bag, I am aware

that the goody bag contained numerous prescription medications that were dispensed by AMI

including Metaxalone, Omeprazole/Sodium Bicarbonate, Allzital, Vanatol, and Temazepam. [18]

72.    On or about December 4, 2018, at the direction of law enforcement, Patient 7

recorded Patient 7's appointment at LOCATION 1. Based upon my review of the recording, I am

aware that Patient 7 was seen by MALIK. During the appointment, MALIK exited the exam

room and KUNDI entered the exam room and handed a Goody Bag to Patient 7 that contained

Vanatol, Diclofenac Sodium, Allzital, and Metaxalone dispensed by AMI. Patient 7 told KUNDI

that Patient 7 did not the medications, to which KUNDI replied that he will stop giving them to

Patient 7 next time until Patient 7 finishes the medications. KUNDI instructed Patient 7 to sign a

tablet to document the payment of a copay, but Patient 7 did not actually pay a copay. MALIK

---

[18] At this time we do not have claims data for Patient 7 for the Goody Bags. We are waiting on records from Geico that should contain claim information.

returned to the exam room and wanted to give Patient 7 an injection. Patient 7 resisted the injection and MALIK ultimately stated that Patient 7 would have to get the injection next time otherwise it would be a problem with authorization for the medications. Former Employee 2 entered the room and asks about the injections. MALIK explains how they have to give injections, therapy and medications. MALIK told Former Employee 2 that he needed four prescriptions, Former Employee 2 handed MALIK four pre-signed blank prescriptions and MALIK filled in the prescriptions, including one for Oxycodone, and gave them to Patient 7.

73.     Based on my review of the PDMP data, below is a summary of prescriptions for Schedule II controlled substances that ANAND or Former Employee 2 prescribed for Patient 7. I am aware that on 28 dates, ANAND or MAKAROVA prescribed morphine and/or oxycodone to Patient 7 and the average MME/day was approximately 160. On 22 of those dates, the prescriptions were for Morphine ER 30 mg tablets and Oxycodone HCL 15 mg tablets.

| Approximate Date Prescription Written | Prescribed Schedule II Controlled Substance | Quantity | Days of Supply | MME/Per Day |
|---|---|---|---|---|
| August 14, 2018 | Morphine sulf ER 30 mg tablet | 60 | 30 | 60.0 MME |
| August 14, 2018 | Oxycodone HCL 15 mg tablet | 120 | 30 | 90.0 MME |
| November 6, 2018 | Morphine sulf ER 30 mg tablet | 60 | 30 | 60.0 MME |
| November 6, 2018 | Oxycodone HCL 15 mg tablet | 120 | 20 | 135.0 MME |
| December 4, 2018 | Oxycodone HCL 15 mg tablet | 120 | 30 | 90.0 MME |
| December 4, 2018 | Morphine sulf er 30 mg tablet | 60 | 30 | 60.0 MME |

74. Based upon my review of ANAND's foreign travel history and border crossings, I am aware that ANAND was out of the United States from August 26, 2015 and September 8, 2015, September 2, 2016, and September 18, 2016 and March 9, 2017 and March 25, 2017. Based upon my review of PDMP data and claims data from IBC and Medicare, I am aware that ANAND submitted claims for Goody Bags and purportedly wrote prescriptions for controlled substances while he was not in the United States. Specifically, the PDMP data revealed 31 Schedule II controlled substance prescriptions in ANAND's name; Medicare data revealed that ANAND purportedly wrote a total of 67 Goody Bag prescriptions and was paid approximately $25,494; and IBC data revealed that ANAND prescribed approximately 15 Goody Bag medications and was paid approximately $13,401.

75. Between November 1, 2015 and July 17, 2019, ANAND was paid a total of approximately $4,080,167 by Medicare, OPM, and IBC for medically unnecessary Goody Bag medications. Below is a chart demonstrating the approximate amount paid by each health insurance benefit program:[19]

| Health Insurance | Amount Paid |
| --- | --- |
| Medicare | $1,813,425 |
| OPM | $11,655 |
| IBC | $2,255,267 |

---

[19] As stated earlier, the DISPENSARIES were not enrolled in OWCP. ANAND has billed OWCP approximately $27,387 for services and was paid approximately $12,254. OWCP claims data does not include the name of the prescribing physician. Based upon a review of patient charts seized pursuant to the order requested in this application, we would be able to determine what medications ANAND prescribed to the OWCP claimants.

## VI.   INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

76.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require DrChrono to disclose to the government copies of electronic medical records maintained under Anand's account, and other information particularly described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## VII.   CONCLUSION

77.     Based on the foregoing, there is probable cause to believe that the Subject Premises contains the items set forth in Attachment B, which constitute evidence, contraband, and/or instrumentalities of the violations of Title 18, United States Code, § 371 (conspiracy to defraud the United States), Title 18, United States Code, § 1343 (wire fraud); Title 18, United States Code, § 1347 (health care fraud); Title 18, United States Code, § 1349 (conspiracy to commit health care fraud and wire fraud), and Title 21, United States Code §§ 841(a)(1) and 846 (conspiracy to distribute controlled substances), among other statutes.

78.     Based on the information contained herein, as well as Affiant's training and experience, Affiant believes there is probable cause to believe that ANAND has submitted or caused the submission of false and fraudulent claims to Medicare, OPM, OWCP, and IBC for the provision of medically unnecessary prescription medications.  Further, there is probable cause to believe that ANAND knowingly and intentionally distributed a controlled substance outside the usual course of professional practice and not for a legitimate medical purpose.  Based on the information listed above, as well as Affiant's training and experience, there is probable cause to

believe that there exists at the Subject Premises in Attachment A, items described in Attachment B which will constitute evidence of such crimes.

79.    Based on the forgoing, I request that the Court issue the proposed search warrant.

80.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## VIII.    REQUEST FOR SEALING

81.    I respectfully request that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. These documents discuss an ongoing criminal investigation that is neither public nor known to the targets of the investigation. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness. Accordingly, there is good cause to seal these documents.

Respectfully submitted,

MARTIN MCDONALD
Special Agent
Federal Bureau Of Investigation

Subscribed and sworn to before me on August_____, 2019

UNITED STATES MAGISTRATE JUDGE

<u>Certificate of Service</u>

I, Coley O. Reynolds, Esquire, counsel for Neil K. Anand, the defendant, hereby certify  a true and correct copy of the attached Motion has been served upon the following:

Darren C. Halverson, Esquire
U.S. Department of Justice
Suite 700
970 Broad Street
Newark, NJ 07102
(*via ECF and email: darren.helverson@usdoj.gov*)

Paul J. Koob, Esquire
U.S. Department of Justice
Criminal Division, Fraud Section
402 E. State Street, Suite 430
Trenton, NJ 08608
(*via ECF and email: paul.koob2@usdoj.gov*)

Kathleen M. Gaughan, Esquire
Counsel for Asif Kundi
Federal Defender's Office
601 Walnut Street, Suite 540
Philadelphia, PA 19106
(*via ECF and email: kathleen_gaughan@fd.org*)

Dina Chavar, Esquire
Counsel for Atif Mahmood Malik
1007 North Orange Street, 4th Floor
Wilmington, DE 19801
(*via ECF and email: dina@dinachavar.com*)

Paul J. Hetznecker, Esquire
1420 Walnut Street, Suite 911
Philadelphia, PA 19102
(*via ECF and email: phetznecker@aol.com*)

Dated: October 16, 2023          */s/ Coley O. Reynolds*
                                 Coley O. Reynolds, Esquire